# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Blue Cross and Blue Shield of North Carolina, f/k/a North Carolina Blue Cross and Blue Shield, Inc.; Blue Cross and Blue Shield of Alabama; Cambia Health Solutions, Inc.; Asuris Northwest Health; Regence BlueShield of Idaho, Inc.; Horizon Healthcare Services, Inc., d/b/a Horizon Blue Cross Blue Shield of New Jersey; Horizon Healthcare of New Jersey, Inc., d/b/a Horizon NJ Health; Regence BlueCross BlueShield of Oregon; Regence BlueCross BlueShield of Utah; Regence BlueShield of Washington, d/b/a Regence BlueShield; Blue Cross Blue Shield of North Dakota, f/k/a Noridian Mutual Insurance Company,

       Plaintiffs,

v.

Rite Aid Corp. and Rite Aid Hdqtrs. Corp.,

       Defendants.

File No. 20-cv-1731 (ECT/KMM)

**OPINION AND ORDER**

---

Kelly Hibbert, Daniel William Wolff, Jerome P. DeSanto, Kent Alan Gardiner, Stephen John McBrady, and Zachary Ian Ruby, Crowell & Moring LLP, Washington, D.C.; David R. Crosby and Kadee Jo Anderson, Stinson LLP, Minneapolis, MN, for Plaintiffs.

Michael James Ableson, Morgan Lewis & Bockius LLP, New York, NY; David Weese Marston, Jr., Morgan Lewis & Bockius LLP, Miami, FL; Margot Bloom and Troy S. Brown, Morgan Lewis & Bockius LLP, Philadelphia, PA; Andrew R. Shedlock and K. Jon Breyer, Kutak Rock LLP, Minneapolis, MN, for Defendants.

This is a case about prescription drug prices.  Plaintiffs are eleven corporations that provide health care plans and services to millions of individuals throughout the United States.  Defendants—who will be referred to collectively as "Rite Aid"—operate one of the largest retail drugstore chains in the United States.

It's more complicated than this, but Plaintiffs allege essentially that Rite Aid overcharged them for prescription drugs it sold and dispensed to individuals for whom Plaintiffs provided prescription-drug coverage.  Plaintiffs allege that, for each drug Rite Aid sold, Rite Aid was legally obligated to report the drug's "usual and customary price." Plaintiffs would then pay Rite Aid an amount based on the lesser of the usual and customary price or a negotiated price.  According to Plaintiffs, Rite Aid reported inflated usual and customary prices, and its inflated price reporting caused Plaintiffs to pay more than they should have on millions of claims resulting in overcharges worth hundreds of millions of dollars.  Invoking diversity jurisdiction, Plaintiffs assert common-law claims for fraud, fraudulent concealment, negligent misrepresentation, and unjust enrichment.

Rite Aid seeks dismissal on several grounds under Federal Rule of Civil Procedure 12(b).  The first two grounds are jurisdictional: it argues that there is not subject-matter jurisdiction because Plaintiffs have failed to plead an Article III-worthy injury, and it challenges personal jurisdiction because, it argues, there is an insufficient connection between Rite Aid's lawsuit-related activities and Minnesota.  Alternatively, Rite Aid argues that Plaintiffs have failed to plead claims on which relief may be granted.

Rite Aid's motion will for the most part be denied.  Whether Plaintiffs allege an Article III injury is a no-doubter.  They do, meaning there is subject-matter jurisdiction

over this case.  Though it is a closer question, the better answer at this preliminary stage is that there is personal jurisdiction over Rite Aid because it communicated most of the millions of allegedly fraudulent claims to Plaintiffs through a pharmacy benefit manager located in Minnesota.  Finally, with the exception of their negligent misrepresentation claim, Plaintiffs plead plausible claims and, where required, Plaintiffs' factual allegations satisfy the particularity-in-pleading requirement of Rule 9(b).

I[1]

Rite Aid is incorporated under Delaware law and maintains its principal place of business in Pennsylvania.  Compl. ¶¶ 20–21 [ECF No. 1].  It is "one of the largest retail drugstore chains in the United States" and operates more than 2,400 retail locations in eighteen states, though not in Minnesota.  *Id.* ¶ 21 (citation omitted); Ableson Decl. ¶ 2, Ex. A [ECF No. 45-1 at 5, 14, 23, 30, 39, 47, 55, 63, 72, 81, 90, 98, 106] (identifying number of stores by state for fiscal years 2008–2020).

Each of the eleven Plaintiffs "provides a full spectrum of health care plans and services to . . . [individual] members."  Compl. ¶¶ 9–19.  Eight of the eleven Plaintiffs are "independent licensee[s] of the Blue Cross and Blue Shield Association."  *Id.* ¶¶ 9–11,

---

[1]    In accordance with the standards governing a Rule 12(b)(6) motion, the facts are drawn entirely from Plaintiffs' Complaint, *Gorog v. Best Buy Co.*, 760 F.3d 787, 792 (8th Cir. 2014), or from public records and materials embraced by the Complaint, *Noble Sys. Corp. v. Alorica Cent., LLC*, 543 F.3d 978, 983 (8th Cir. 2008).

3

14–18.  Every Plaintiff is incorporated and maintains its principal place of business in a state other than Delaware, Pennsylvania, or Minnesota.  *Id.* ¶¶ 9–19.[2]

"At all relevant times, Rite Aid was, is, and has been a network pharmacy for every Plaintiff, meaning that Plaintiffs' [m]embers can use their prescription drug benefit to fill their prescriptions at Rite Aid pharmacy locations at in-network pricing."  *Id.* ¶ 23.  The price Plaintiffs pay for a prescription drug is based on the lesser of a negotiated price or the drug's "usual and customary" price.  *Id.* ¶¶ 1–2, 38, 43, 50(c).

The usual and customary (or "U&C") price is "generally defined as the cash price to a member of the general public paying for a prescription drug without insurance." *Id.* ¶ 1; *see also id.* ¶¶ 30–31.  This cash price isn't always the same.  Market conditions might cause it to rise or fall.  Important here, some uninsured, cash-paying individuals pay discounted prices.  *Id.* ¶¶ 5, 57, 59–61.  In these situations, "the true U&C price" is the lowest price for which a prescription drug is "widely and consistently available[.]"  *Id.* ¶ 69.  Authoritative pronouncements from some public and private sources require the prices offered through pharmacy discount programs to be reported as U&C prices.  *Id.* ¶¶ 32–33.

The relationship between Plaintiffs and Rite Aid is indirect; positioned between Plaintiffs and Rite Aid are pharmacy benefit managers (or "PBMs").  *Id.* ¶¶ 23, 50. Plaintiffs contract with "PBMs to adjudicate and administer prescription benefits with a

---

[2]      Plaintiffs have filed a motion to consolidate this case with *BCBSM, Inc. v. Rite Aid Corp.*, No. 20-cv-2132 (ECT/KMM).  The plaintiffs in that case are incorporated under the law of, and maintain their principal places of business in, Minnesota.  *BCBSM, Inc.*, Compl. ¶¶ 9–10 [ECF No. 1].  The consolidation motion will be decided separately.

network of pharmacies on their behalf." *Id.* ¶ 48. "When a health plan employs the services of a PBM, instead of submitting claims directly to the health plan, the retail pharmacy submits claims for payment from the health plan to the health plan's chosen PBM." *Id.* Rite Aid also contracts with PBMs as a part of maintaining its network relationship with Plaintiffs. *See id.* ¶ 37. In other words, when Rite Aid submits a claim to a PBM for reimbursement by a health plan, Rite Aid does so under a contract between it and the PBM. *Id.*

The Complaint concisely describes the process by which Rite Aid's prescription-drug charges go through PBMs and reach Plaintiffs for payment, *id.* ¶ 50: (1) One of Plaintiffs' members "presents a prescription at a Rite Aid pharmacy . . . and purchases the corresponding prescription drug, less the share of the purchase price covered by the [m]ember's prescription drug benefit." *Id.* ¶ 50(a). (2) "Rite Aid then reports to the [appropriate] Plaintiff's PBM the data associated with the sale, including the U&C charge for the drug it dispensed[.]" *Id.* ¶ 50(b). (3) "Using Rite Aid's reported information, the Plaintiff's PBM adjudicates the claim on Plaintiff's behalf using the 'lesser of' logic that incorporates the U&C price term." *Id.* ¶ 50(c). In other words, if the U&C charge Rite Aid reported is greater than the negotiated price, then a "Plaintiff pays, through its PBM, the negotiated price to Rite Aid." *Id.* If the reported U&C charge is less than the negotiated price, then a Plaintiff pays, through its PBM, the reported U&C price. *Id.* Some Plaintiffs' contracts with PBMs explicitly required that discounts—or at least some discounts—given by network pharmacies like Rite Aid be included in the determination of a prescription drug's U&C price. *Id.* ¶¶ 35(b), (e), (h), (i).

5

Plaintiffs' central allegation is that "Rite Aid has systematically misrepresented its U&C charges—the cash price uninsured customers pay for prescription drugs—to Plaintiffs and other payors" because Rite Aid knowingly did not report prices it offered through a discount program as U&C prices. *Id.* ¶ 54; *see also id.* ¶¶ 5–6, 54–72. Rite Aid implemented a prescription-drug-discount program in reaction to competition from big-box retail stores. *Id.* ¶¶ 3, 55–57. In 2006, Walmart—and soon after, Target and Costco—each adopted discount programs "that offered steeply discounted prices for hundreds of popular prescription drugs to cash customers." *Id.* ¶ 55. "Many retailers whose primary line of business was not operating a pharmacy, which were able to absorb lower margins on generic drug sales because pharmacy sales represent such a low percentage of total sales, followed suit." *Id.* "The new competition from big[-]box retailers placed enormous pressure on Rite Aid pharmacies to match those discount prices in order to retain Rite Aid's cash-paying customers." *Id.* ¶ 57. Therefore, "around September 2008, Rite Aid launched the nationwide Rx Savings Card Program ("RSC Program")[.]" *Id.* ¶ 5. "The RSC Program offers steeply discounted prices on thousands of widely prescribed generic and brand drugs to customers who paid for their prescriptions without using insurance." *Id.* ¶ 60. "The RSC Program is free to any member of the public." *Id.* ¶ 59. There is no cost to join, and there are no eligibility criteria. *Id.* All who enroll are accepted into the program. *Id.*

"Since Rite Aid launched its RSC Program nationwide in September 2008, it has falsely represented its U&C charges on claims paid by Plaintiffs." *Id.* ¶ 66. Rite Aid did not report "its discounted RSC Program prices, third-party discount card program prices,

or other discounted cash prices as U&C[.]" *Id.* Instead, though "cash sales under the RSC Program (and other similar programs) far exceeded Rite Aid's sales at" non-discounted prices paid by non-insured, cash-paying customers, Rite Aid reported "U&C prices that were paid by few—if any—actual cash customers, and were regularly five, ten, or even twenty times higher than what Rite Aid actually charged cash customers without insurance." *Id.* ¶ 6; *see also id.* ¶¶ 66, 68. As a result, "[f]or many millions of transactions, Rite Aid caused Plaintiffs to pay Rite Aid the negotiated price because the negotiated price was lower than the *reported inflated* U&C price." *Id.* ¶ 69. "Since September 2008, Rite Aid has submitted to Plaintiffs, through Plaintiffs' PBMs, more than **37 million** brand and generic retail pharmacy claims for payment[.]" *Id.* ¶ 71. "For those approximately 37 million claims, Plaintiffs have reimbursed Rite Aid more than **$1.8 billion**." *Id.* "Plaintiffs were overcharged hundreds of millions of dollars." *Id.* ¶ 8.

## II

Start with Rite Aid's challenge to subject-matter jurisdiction. Rite Aid argues that "the Complaint fails to plead facts sufficient to satisfy the 'injury in fact' requirement of Article III standing." Defs.' Mem. in Supp. at 16 [ECF No. 44]. Because Rite Aid challenges only the Complaint's sufficiency, this is a "facial" challenge to subject-matter jurisdiction. *Branson Label, Inc. v. City of Branson*, 793 F.3d 910, 914 (8th Cir. 2015). In analyzing a facial attack, a court "restricts itself to the face of the pleadings, and the non-moving party receives the same protections as it would defending against a motion brought under Rule 12(b)(6)." *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990) (citations omitted).

To plead Article III standing, a plaintiff must allege facts showing it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (U.S. 2016). "To establish injury in fact, a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Id.* (internal quotation marks omitted) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). When an alleged harm is "economic," "the 'injury in fact' question is straightforward." *Wallace v. ConAgra Foods, Inc.*, 747 F.3d 1025, 1029 (8th Cir. 2014) (citation omitted). "Standing under Article III to bring a claim in federal court is distinct from the merits of a claim[.]" *Enter. Fin. Grp., Inc. v. Podhorn*, 930 F.3d 946, 950 (8th Cir. 2019).

Plaintiffs (obviously) plead an injury in fact. Plaintiffs allege that they "were overcharged hundreds of millions of dollars[]" because Rite Aid reported "fraudulently inflated U&C prices." Compl. ¶¶ 6, 8. Rite Aid seems to acknowledge these allegations and Plaintiffs' theory of the case. Defs.' Mem. in Supp. at 16–17. Rite Aid nonetheless argues that:

> unless Plaintiffs *produce* the contracts between themselves and the PBMs and explain how, under the terms of those contracts, they supposedly would have suffered an injury if Rite Aid reported an "inflated" U&C price, Plaintiffs have failed to carry their burden of pleading facts sufficient to establish standing.

*Id.* at 17 (emphasis added).

8

There are (at least) three problems with this argument: (1) It misunderstands Article III's injury-in-fact requirement. At the pleading stage, Article III doesn't require a federal plaintiff to "produce" evidence or prove its injury. It requires a federal plaintiff to allege a cognizable injury. And complaints like Plaintiffs' that allege "economic or physical harms" are almost always no-doubters. *Hein v. Freedom from Religion Found., Inc.*, 551 U.S. 587, 642 (2007) (Souter, J., dissenting). This is true even if the alleged harm is "only a few pennies[.]" *Wallace*, 747 F.3d at 1029. Of course, difficult questions may surface in a case where a plaintiff alleges non-economic injuries, *Hein*, 551 U.S. at 642 (Souter, J., dissenting), but this isn't that kind of case. (2) It seems to conflate Article III's injury-in-fact requirement with the damages aspect of Plaintiffs' claims. Really, Rite Aid's argument is that Plaintiffs cannot establish their claimed damages unless the contracts between Plaintiffs and their PBMs "obligated Plaintiffs to pay the PBMs a price dependent upon Rite Aid's reported U&C price." Defs.' Mem. in Supp. at 16. But that is a merits issue, not an Article III issue. Plaintiffs allege economic injury, and that is enough for Article III. (3) It assumes the absence of an allegation that is in the Complaint. If Article III required Plaintiffs to allege that their PBM contracts "obligated Plaintiffs to pay the PBMs a price dependent upon Rite Aid's reported U&C price," *id.* at 16, Plaintiffs allege this fact (or its equivalent) several times in their Complaint. *E.g.*, Compl. ¶¶ 2, 35(a)–(i). Subject-matter jurisdiction is not lacking here for a failure to plead Article III injury.

### III

Rite Aid challenges personal jurisdiction and venue in Minnesota under Rules 12(b)(2) and (b)(3), respectively, and it has moved under authority of 28 U.S.C. § 1406(a)

to transfer the case to the United States District Court for the Middle District of Pennsylvania, where its headquarters is located. Section 1406(a) says that "[t]he district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." Though § 1406(a) refers only to a transfer for improper venue, the statute has long been understood also to give district courts the power to transfer cases for lack of personal jurisdiction. *Goldlawr, Inc. v. Heiman,* 369 U.S. 463, 466 (1962); *see also Eggleton v. Plasser & Theurer Exp. Von Bahnbaumaschinen Gesellschaft, MBH*, 495 F.3d 582, 584 (8th Cir. 2007); *PKG Contracting, Inc. v. Smith & Loveless, Inc.*, CIV. NO. 19-4067, 2020 WL 906760, at *8–9 (D.S.D. Feb. 25, 2020).

"Personal jurisdiction . . . is an essential element of the jurisdiction of a district . . . court, without which the court is powerless to proceed to an adjudication." *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999) (second alteration in original) (citation and internal quotation marks omitted). "When personal jurisdiction is challenged by a defendant, the plaintiff bears the burden to show that jurisdiction exists." *Fastpath, Inc. v. Arbela Techs. Corp.*, 760 F.3d 816, 820 (8th Cir. 2014) (citations omitted). "To successfully survive a motion to dismiss challenging personal jurisdiction, a plaintiff must make a prima facie showing of personal jurisdiction over the challenging defendant." *Id.* (citations omitted). A prima facie showing requires a plaintiff to plead facts sufficient "to support a reasonable inference that the defendant can be subjected to jurisdiction within the state." *K-V Pharm. Co. v. J. Uriach & CIA, S.A.*, 648 F.3d 588, 591–92 (8th Cir. 2011) (citation and alteration omitted). The plaintiff will not have to prove personal jurisdiction

10

by a preponderance of the evidence "until trial or until the court holds an evidentiary hearing." *Epps v. Stewart Info. Servs. Corp.*, 327 F.3d 642, 647 (8th Cir. 2003).

For the exercise of personal jurisdiction to be proper, it must comport with both the forum state's long-arm statute and due process. *Creative Calling Sols., Inc. v. LF Beauty Ltd.*, 799 F.3d 975, 979 (8th Cir. 2015); *see also* Fed. R. Civ. P. 4(k)(1)(A); *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014). Because Minnesota's long-arm statute, Minn. Stat. § 543.19, is "coextensive with constitutional limits," this two-part issue boils down to one: whether the exercise of personal jurisdiction comports with due process. *Johnson v. Woodcock*, 444 F.3d 953, 955 (8th Cir. 2006). Due process requires that a defendant have sufficient "minimum contacts" with the forum state so that "maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Daimler AG*, 571 U.S. at 126 (citations and internal quotation marks omitted). This means "actions by the defendant[s]" themselves must "create a substantial connection with the forum State" and provide "fair warning" to the defendants that they may be subject to jurisdiction there. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472, 475 (1985) (citations and internal quotation marks omitted). The "fair warning" requirement will be met if defendants have "'purposefully directed' [their] activities at residents of the forum, and the litigation results from alleged injuries that 'arise out of or relate to' those activities." *Id.* at 472–73 (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984), and *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984)).

Our Eighth Circuit Court of Appeals has identified five factors that district courts are to consider in determining whether there is personal jurisdiction over a defendant: (1)

the nature and quality of contacts with the forum state; (2) the quantity of those contacts; (3) the relationship between the cause of action and the contacts; (4) the state's interest in providing a forum for its residents; and (5) the convenience to the parties. *Johnson v. Arden*, 614 F.3d 785, 794 (8th Cir. 2010) (citation omitted). The first three factors are of primary importance, and the remaining two are secondary. *Burlington Indus., Inc. v. Maples Indus., Inc.*, 97 F.3d 1100, 1102 (8th Cir. 1996).[3]

---

[3]     It's important to keep the Eighth Circuit's description of the last two factors as having "secondary" importance in context. After all, the Supreme Court says that, assuming a defendant's purposeful establishment of "minimum contacts within the forum [s]tate," these two considerations are relevant to "determine whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice.'" *Burger King Corp.*, 471 U.S. at 476–77 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 320 (1945)). The Eighth Circuit's description of the first three factors as "primary" seems to date to then-Judge Blackmun's opinion in *Aftanase v. Economy Baler Co.*, 343 F.2d 187, 197 (8th Cir. 1965). That opinion refers to the remaining two factors, the "interest of the forum state and convenience," as "other" factors that "receive mention" in the Supreme Court's personal-jurisdiction decisions. *Id.* The Eighth Circuit did not start explicitly describing those factors as "secondary" until later. *Thompson v. Ecological Sci. Corp.*, 421 F.2d 467, 469 (8th Cir. 1970). Consistent with Supreme Court precedent, the better understanding of the Eighth Circuit's statements that the last two factors are "not determinative" or "not dispositive" is that those factors cannot establish jurisdiction when there are not otherwise minimum contacts with the forum. One of the earliest cases to use one of those phrases described the convenience factors as "not determinative" after already concluding that there were insufficient minimum contacts, *Aaron Ferer & Sons Co. v. Atlas Scrap Iron & Metal Co.*, 558 F.2d 450, 455–56 (8th Cir. 1977), and that same scenario turns up frequently, *see, e.g.*, *Pederson v. Frost*, 951 F.3d 977, 981 n.4 (8th Cir. 2020); *Fastpath, Inc. v. Arbela Techs. Corp.*, 760 F.3d 816, 824 (8th Cir. 2014); *Porter v. Berall*, 293 F.3d 1073, 1076–77 (8th Cir. 2002); *Land-O-Nod Co. v. Bassett Furniture Indus., Inc.*, 708 F.2d 1338, 1340–42 (8th Cir. 1983). By contrast, courts can and do consider the convenience and state-interest factors when minimum contacts exist. *See, e.g.*, *Lakin v. Prudential Sec., Inc.*, 348 F.3d 704, 713 (8th Cir. 2003). That said, research has not disclosed any Eighth Circuit case in which serious inconvenience or the lack of a forum-state interest has overcome otherwise constitutionally sufficient minimum contacts. This seems surprising, but perhaps it shouldn't be. After all, the Supreme Court appears to recognize that such a result would be rare. *See Burger King Corp.*, 471 U.S. at 477 (stating that a defendant would have to "present a compelling case" to achieve it).

12

The Parties' personal-jurisdiction arguments concern only the Complaint. Rite Aid says that the Complaint's allegations are insufficient to establish personal jurisdiction, and Plaintiffs say they are. Neither Rite Aid nor Plaintiffs has introduced affidavits or other evidentiary materials not embraced by the Complaint to support their position. The issue, then, is whether the Complaint's allegations plausibly "make a prima facie showing of personal jurisdiction over [Rite Aid]." *Fastpath, Inc.*, 760 F.3d at 820.

On this question, the Parties' positions are easy to summarize. Plaintiffs argue that they have alleged a prima facie showing of specific personal jurisdiction over Rite Aid because Rite Aid "purposefully targeted reimbursement claims to be adjudicated on behalf of, and paid by, all Plaintiffs to PBMs located within this judicial district, including Prime Therapeutics LLC ("Prime"), which is headquartered in Eagan, Minnesota." Compl. ¶ 28; Pls.' Mem. in Opp'n at 39–50 [ECF No. 55]. Plaintiffs characterize Minnesota as "ground zero for the bulk of the fraud." Pls.' Mem. in Opp'n at 41. Rite Aid says essentially that its transmission of claim information to Prime is too remote from the core of Plaintiffs' claims to make a prima facie showing of personal jurisdiction in Minnesota. Defs.' Mem. in Supp. at 10–15; Defs.' Reply Mem. at 2–6 [ECF No. 61].

Start with the third of the Eighth Circuit's five factors—the relation of the cause of action to the contacts. This factor distinguishes specific jurisdiction from general jurisdiction. "Specific jurisdiction exists over causes of action arising out of or related to a defendant's contacts with the forum state," whereas "general jurisdiction is broader and reaches *any* cause of action against a defendant whose forum contacts 'are so "continuous and systematic" as to render [it] essentially at home in the forum [s]tate.'" *Quality Bicycle*

13

*Prods., Inc. v. BikeBaron, LLC*, No. 12-cv-2397 (RHK/TNL), 2013 WL 3465279, at *3 (D. Minn. July 10, 2013) (alterations in original) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (citation omitted)). Here, Rite Aid is indisputably not "at home" in Minnesota, making this a question of specific personal jurisdiction.

Analysis of the nature and quality of Rite Aid's Minnesota contacts (as alleged in the Complaint) yields something of a mixed result: the contacts' nature and quality lean in favor of exercising personal jurisdiction over Rite Aid in Minnesota, but not decidedly so. On the side favoring personal jurisdiction, this case is all about Rite Aid's representations of the U&C prices for prescription drugs it dispensed and sold to individuals insured under Plaintiffs' plans. Rite Aid represented these U&C prices to Plaintiffs' PBMs. For most of the claims at issue in this case, Prime was the relevant PBM, meaning that Rite Aid transmitted its U&C representations to Prime at its Minnesota headquarters. Though the Complaint's description of the duration of each Plaintiff's relationship with Prime is imprecise (more on that in a bit), Plaintiffs allege that each of them had a relationship with Prime, and Plaintiffs allege that their relationships with Prime collectively span decades. Plaintiffs also allege that Rite Aid entered into a contract—what the Complaint calls a "Participating Pharmacy Agreement"—that governed Rite Aid's relationship with Prime. From these allegations, it seems plausible to infer that Rite Aid created "continuing obligations" between itself and Prime of the kind the Supreme Court has said show a substantial connection with the forum and purposeful availment of the privilege of conducting activities within Minnesota. *Burger King Corp.*, 471 U.S. at 474–76.

14

It is true, at least as a practical matter, that Rite Aid's Minnesota contacts caused injury elsewhere.  No Plaintiff in this case is a Minnesota citizen, and it seems more apt to think that Plaintiffs sustained their bottom-line injuries at their headquarters.  This fact weighs against the exercise of personal jurisdiction over Rite Aid here, but not so much that it overrides the centrality of Rite Aid's Minnesota contacts to Plaintiffs' claims.  This is so for several reasons.  "The primary focus of [the] personal jurisdiction inquiry is the defendant's relationship to the forum State."  *Bristol-Myers Squibb Co. v. Sup. Ct. of Cal., San Francisco Cnty.*, ___ U.S. ___, 137 S. Ct. 1773, 1779 (2017).  If the primary focus is Rite Aid's relationship to Minnesota, it is better to infer that Plaintiffs' relationships with Minnesota are secondary, or at least somewhat less significant.  *See Hanson v. Denckla*, 357 U.S. 235, 253 (1958) (recognizing that no plaintiff can establish jurisdiction over a defendant through his own actions).  In the abstract, it seems unremarkable that a plaintiff might suffer injuries away from a forum state.  For example, a North Dakota citizen who is severely injured in a car accident in Minnesota may continue to suffer from her injuries after returning to North Dakota.  And a Wisconsin citizen defrauded into purchasing worthless land in Minnesota may be said to suffer financial injury in Wisconsin.  In either case, the fact that each hypothetical plaintiff experienced or suffered from injuries outside Minnesota would not rule out the exercise of personal jurisdiction over the appropriate defendant in Minnesota.  Finally, though Plaintiffs suffered injuries at their headquarters in states other than Minnesota, Rite Aid's injury-causing representations were directed at Minnesota.

The quantity of Rite Aid's relevant contacts appears to be significant and favors the exercise of personal jurisdiction at this stage. Plaintiffs allege that Rite Aid submitted tens of millions of "brand and generic retail pharmacy claims for payment" to Plaintiffs through Plaintiffs' PBMs. Compl. ¶ 71. Plaintiffs allege that Rite Aid transmitted most of the at-issue claims to Prime. *See id.* ¶¶ 35(b), (c), (e), (g), (i); *see also* Pls.' Mem. in Opp'n at 40–41. For these claims, Plaintiffs allege they "have reimbursed Rite Aid more than **$1.8 billion**[,]" Compl. ¶ 71, and that "[f]or many millions of transactions, Rite Aid caused Plaintiffs to pay Rite Aid the negotiated price because the negotiated price was lower than the *reported inflated* U&C price[,]" *id.* ¶ 69. When just Rite Aid's Minnesota case-related contacts are considered (again, more on that in a bit), they appear practically innumerable.

Rite Aid advances several arguments to show that it lacks the "minimum contacts" with Minnesota necessary to justify the exercise of personal jurisdiction here, but these arguments are not persuasive. Rite Aid points out that its headquarters are in Pennsylvania and that it has no "Rite Aid-branded pharmacies in Minnesota," Defs.' Mem. in Supp. at 11, but that doesn't answer Plaintiffs' position. Plaintiffs do not allege that Rite Aid is at home in Minnesota (*i.e.*, a theory of general jurisdiction) or that Rite Aid's retail store locations support the exercise of personal jurisdiction. Rite Aid says that "none of the conduct giving rise to Plaintiffs' claims occurred in Minnesota." *Id.* As support for this position, Rite Aid cites *Bristol-Myers Squibb Co.* There, the Supreme Court held that California courts lacked personal jurisdiction over the claims of certain individual plaintiffs who alleged personal injuries caused by Plavix, a drug manufactured by Bristol-Myers Squibb. 137 S. Ct. at 1777. These plaintiffs did not reside in California, "were not

prescribed Plavix in California, did not purchase Plavix in California, did not ingest Plavix in California, and were not injured by Plavix in California." *Id.* at 1781. Therefore, "a connection between the forum and the specific claims at issue" was "missing." *Id.* This case is different. It is not correct to say that there is no connection between Minnesota and Plaintiffs' claims. As explained, Plaintiffs allege that Rite Aid directed most of its false U&C representations to Prime in Minnesota over many years and that these Minnesota-directed misrepresentations caused Plaintiffs' injuries. Rite Aid argues that "where a defendant is alleged to have engaged in an act of deception, personal jurisdiction will only attach if the alleged deception was aimed <u>at the forum state itself</u>, and not merely an entity that happens to reside in that forum." Defs.' Mem. in Supp. at 13. If this is intended as a statement of controlling law, its source and meaning are not obvious. Together, the cases cited to support this statement seem to say only that specific personal jurisdiction in a misrepresentation or fraud case requires a connection between the assertedly unlawful activity and the forum. *E.g.*, *Mack v. Britto Cent., Inc.*, No. 13-cv-197 (SRN/JJG), 2014 WL 1608364, at *4 (D. Minn. Apr. 21, 2014) (finding no personal jurisdiction where plaintiff had not shown "that any [d]efendant 'aimed its conduct at Minnesota . . . or that Minnesota was somehow the focal point for the alleged wrongdoing.'" (quoting *Jacobs Trading, LLC v. Ningbo Hicon Int'l Indus. Co.*, 872 F. Supp. 2d 838, 847 (D. Minn. 2012))). Here, that connection exists. Plaintiffs allege that Minnesota was the focal point—in their words, "ground zero," Pls.' Mem. in Opp'n at 41—for the fraud. And the Complaint makes clear that Rite Aid's transmission of alleged misrepresentations to Prime

was not happenstance, but the intended result of reticulated contractual arrangements between Plaintiffs, Prime Therapeutics, and Rite Aid. [4]

Considered against Rite Aid's minimum contacts, the better conclusion at this stage is that the Eighth Circuit's final two factors do not change things. Evaluating Minnesota's "interest in adjudicating the dispute," *World-Wide Volkswagen Corp.*, 444 U.S. at 292, is an inexact science. No Plaintiff is a Minnesota citizen or resident, but Plaintiffs allege a Minnesota citizen (Prime) received and adjudicated "many millions" of fraudulent claims, Compl. ¶ 69, that caused Plaintiffs to be "overcharged hundreds of millions of dollars[,]" *id.* ¶ 8. In other words, we're not talking about a case with an injured Minnesota citizen, where Minnesota's interest might be heightened. But we are talking about a case with a Minnesota citizen that served (allegedly) as the focal point of a substantial fraud. No authority has been cited identifying the extent of a state's interest under like circumstances. Regardless of the uncertainty attending this question, Rite Aid does not argue that Minnesota's interest is slight enough so that "the assertion of personal jurisdiction would [not] comport with 'fair play and substantial justice.'" *Burger King Corp.*, 471 U.S. at 476 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 320 (1945)). Though Rite Aid reasonably questions whether Plaintiffs' primary incentive to bring this case here is convenience or the chance of taking advantage of Minnesota's six-year tort statute of

---

[4]     The framework outlined in *Calder v. Jones*, 465 U.S. 783 (1984), is relevant to analyzing personal jurisdiction in the intentional-tort context, but neither Plaintiffs nor Rite Aid relies on *Calder*. Importantly, Rite Aid has identified no reason to think that *Calder* requires a different result with respect to Plaintiffs' fraud and fraudulent concealment claims.

limitations, Defs.' Mem. in Supp. at 14, Rite Aid does not argue that Minnesota is an inconvenient forum.

"Rite Aid acknowledges that if it were subject to personal jurisdiction [in Minnesota], then the District of Minnesota would be a proper venue." Defs.' Reply Mem. at 6 n.7. The disposition of the personal jurisdiction question thus also resolves Rite Aid's venue motion under Rule 12(b)(3), and its transfer motion under 28 U.S.C. § 1406(a). Regardless, Rite Aid argues that the case should be transferred *sua sponte* to the Middle District of Pennsylvania under authority of 28 U.S.C. § 1404(a). Rite Aid did not request transfer under § 1404(a) in its motion, and the propriety of the request has not been the subject of briefing or evidentiary submissions. The request will, therefore, be denied.

*

This is not a final resolution of the personal jurisdiction question. If Rite Aid persists in raising the defense, then Plaintiffs eventually will have to prove personal jurisdiction "by a preponderance of the evidence" at an evidentiary hearing or trial. *Epps*, 327 F.3d at 647. With that in mind, it deserves clarifying that potentially relevant questions remain unaddressed. For example, though Plaintiffs allege that most of the at-issue claims went through Prime in Minnesota, Plaintiffs also acknowledge that many of the at-issue claims went through PBMs in other states and have no connection whatsoever to Minnesota. *See* Compl. ¶¶ 35(a), (d), (f), (h). Though Rite Aid's contacts with Prime Therapeutics in Minnesota are numerous viewed in isolation, no comparison has been offered showing Rite Aid's like contacts with PBMs in other states. *See Bristol-Myers Squibb Co.*, 137 S. Ct. at 1778. The relevance of these (and perhaps other) questions and

their effect on the personal jurisdiction analysis has not been addressed by the Parties or considered here.

## IV

Failing dismissal for lack of personal jurisdiction, Rite Aid has moved to dismiss Plaintiffs' claims on three grounds under Federal Rule of Civil Procedure 12(b)(6). Rite Aid first argues that Plaintiffs have failed to plead particular facts plausibly establishing essential elements of each of Plaintiffs' four claims. Rite Aid next argues that Plaintiffs' claims are barred by Minnesota's independent-duty rule. Third, Rite Aid argues that Plaintiffs' claims that predate June 30, 2011, are barred by the six-year limitations period in Minn. Stat. § 541.05.[5]

In reviewing a Rule 12(b)(6) motion, a court must accept as true the factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *Gorog v. Best Buy Co.*, 760 F.3d 787, 792 (8th Cir. 2014) (citation omitted). Though the factual allegations need not be detailed, they must be enough to "raise a right to relief above the speculative level[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation

---

[5] "As this action is in federal court based on diversity of citizenship, state law governs substantive law issues." *Paine v. Jefferson Nat'l Life Ins. Co.*, 594 F.3d 989, 992 (8th Cir. 2010) (citation omitted); *see also Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). Rite Aid says that "all of the allegations in this case concern conduct that occurred in Pennsylvania, and so Pennsylvania law should govern Plaintiffs' claims against Rite Aid." Defs.' Mem. in Supp. at 18. Regardless, Rite Aid acknowledges that it "has not identified any material conflict between Minnesota law and Pennsylvania law[]" and relies on Minnesota law to support its Rule 12(b)(6) motion. *Id.* Plaintiffs also rely on Minnesota law to oppose Rite Aid's motion. Accordingly, Minnesota law will be applied. *See Reid v. Wright Med. Tech., Inc.*, No. 19-cv-1471 (ECT/HB), 2019 WL 4861988, at *2 (D. Minn. Oct. 2, 2019) (applying Minnesota law because "both parties cite[d] to Minnesota law and neither party dispute[d] its applicability").

omitted).  The complaint must "state a claim to relief that is plausible on its face."  *Id.* at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).

## A

In addition to Rule 12(b)(6)'s familiar standards, Rite Aid's challenges to the factual sufficiency of Plaintiffs' claims implicate the particularity-in-pleading requirement of Rule 9(b).  "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  "To satisfy the particularity requirement of Rule 9(b), the complaint must plead such facts as the time, place, and content of the defendant's false representations, as well as the details of the defendant's fraudulent acts, including when the acts occurred, who engaged in them, and what was obtained as a result."  *U.S. ex rel. Joshi v. St. Luke's Hosp., Inc.*, 441 F.3d 552, 556 (8th Cir. 2006).  "The claim must identify who, what, where, when, and how."  *U.S. ex rel. Costner v. United States*, 317 F.3d 883, 888 (8th Cir. 2003).  While Rule 9(b) requires particularity in pleading, "a complaint need not be filled with precise detail[.]"  *Moua v. Jani-King of Minn., Inc.*, 613 F. Supp. 2d 1103, 1110 (D. Minn. 2009).  Rather, "Rule 9(b) is to be read in the context of the general principles of the Federal Rules, the purpose of which is to simplify pleading.  Thus, the particularity required by Rule 9(b) is intended to enable the defendant to respond specifically and quickly to the potentially damaging allegations."  *Costner*, 317 F.3d at 888.  Important here, "[t]he level of particularity required depends on the nature of a case," *E-Shops Corp. v. U.S. Bank Nat'l*

*Ass'n*, 678 F.3d 659, 663 (8th Cir. 2012), and to determine whether a party has satisfied Rule 9(b), courts look to "the complexity or simplicity of the transaction or occurrence, the relationship of the parties and the determination of how much circumstantial detail is necessary to give notice to the adverse party and enable him to prepare a responsive pleading," *Payne v. United States*, 247 F.2d 481, 486 (8th Cir. 1957) (citation omitted).  Also important here, all of Plaintiffs' claims—regardless of label— must comply with Rule 9(b) because each claim is grounded in fraud.  Compl. ¶¶ 93–134; *see Cox v. Mortg. Elec. Registration Sys., Inc.*, 685 F.3d 663, 672–73 (8th Cir. 2012) ("Under Minnesota law, any allegation of misrepresentation, whether labeled as a claim of fraudulent misrepresentation or negligent misrepresentation, is considered an allegation of fraud which must be pled with particularity." (citation omitted)); *Liberty Mut. Fire Ins. Co. v. Acute Care Chiropractic Clinic P.A.*, 88 F. Supp. 3d 985, 1008 (D. Minn. 2015) ("[B]ecause allegations of fraud underlie the unjust enrichment claim, a heightened pleading standard applies.").

1

Plaintiffs' first claim is for common law fraud.  Compl. ¶¶ 93–103.  Under Minnesota law, Plaintiffs must allege facts plausibly establishing five elements: (1) that Rite Aid made a false representation of a material fact susceptible of knowledge; (2) that Rite Aid made the representation with knowledge of its falsity or without knowing whether it was true or false; (3) that Rite Aid made the representation with the intent to induce Plaintiffs to act in reliance on it; (4) that the representation caused Plaintiffs to act in

reliance on it; and (5) that Plaintiffs suffered pecuniary damages as a result of that reliance. *Valspar Refinish, Inc. v. Gaylord's, Inc.*, 764 N.W.2d 359, 368 (Minn. 2009).

Rite Aid challenges the sufficiency of Plaintiffs' fraud claim with a combined Rule 12(b)(6) plausibility and Rule 9(b) particularity argument. It says Plaintiffs have failed to allege facts with sufficient particularity plausibly showing that Rite Aid made a false representation of material fact. Specifically, Rite Aid argues that it "entered into contracts with the PBMs, and those contracts dictated what price Rite Aid was required to report as its U&C price; Plaintiffs do not plead with particularity <u>any facts</u> about what those contracts obligated Rite Aid to report." Defs.' Mem. in Supp. at 19. Rite Aid argues that no extra-contractual source—for example, no industry standard or government guidance— bears on this question, and that "[w]ithout any allegations about what Rite Aid was obligated [under its PBM contracts] to report as its U&C price, Plaintiffs cannot plausibly allege that what Rite Aid in fact reported was a 'false representation.'" *Id.*

If Rite Aid is correct that Minnesota law required Plaintiffs to allege the content of Rite Aid's contracts with PBMs,[6] Plaintiffs plead a plausible fraud claim with sufficient particularity. Plaintiffs allege that Rite Aid contracted with Prime; that the contract required Rite Aid "to report its U&C charge on all claims submitted to Prime for payment

---

[6] This seems like a big if. No authority is cited to support the legal proposition that a contract is the exclusive source of a duty under similar circumstances. And Rite Aid hasn't submitted the contracts that it says exclusively govern its liability. Unanswered questions abound. Does it matter that Plaintiffs weren't parties to Rite Aid's contracts with PBMs? What if a contract's relevant terms contradicted industry standards? What if the terms contradicted government guidance? The law? What do Rite Aid's contracts with PBMs say? The fact that these questions remain unanswered counsels against accepting this argument at this stage.

by Plaintiffs who contracted with Prime as their PBM," Compl. ¶ 37; that Rite Aid's
contract with Prime defined the U&C price using "the same or similar definition" as
Plaintiffs' PBM contracts and required Rite Aid to submit claims using the industry
standard NCPDP[7] Universal Claims Form, *id.* ¶ 39; and that Rite Aid's contract with Prime
"implement[s] the NCPDP requirements and industry standards, which required Rite Aid
to report, as the U&C charge, any discount price offered to cash-paying or 'private pay'
uninsured customers on all claims submitted to Plaintiffs' PBMs," *id.* ¶ 41.  To bolster this
allegation, Plaintiffs cite to Prime's "Pharmacy Provider Manual," which they allege is
incorporated into Rite Aid's contract with Prime.  Compl. ¶ 40 n.34; Ableson Decl., Ex. B
at 3 [ECF No. 45-2].  Prime's Pharmacy Provider Manual directs pharmacies to report a
drug's U&C price as the "lowest price [it] would charge" to a cash-paying customer on the
date dispensed, which "includes any applicable discounts including, but not limited to,
senior discounts, frequent shopper discounts and other special discounts offered to attract
customers."  *Id.* at 30.  Plaintiffs allege that, contrary to these and other industry standards
and guidance, "Rite Aid did not in fact report its RSC Program prices for prescription drugs
as its U&C price."  Compl. ¶ 68.  Instead, "[f]or many millions of transactions," *id.* ¶ 69,
Rite Aid reported "U&C prices that were paid by few—if any—actual cash customers, and
were regularly five, ten, or even twenty times higher than what Rite Aid actually charged
cash customers without insurance," *id.* ¶ 6.

---

[7]     "NCPDP" is the National Council for Prescription Drug Programs, "an accredited,
non-profit organization that maintains the industry standard for electronic transmission and
adjudication of pharmacy claims."  Compl. ¶ 2, n.1.

It is not accurate to say that the Complaint fails to allege the contents of Rite Aid's PBM contracts where U&C prices are concerned. Plaintiffs pull from several sources (including Rite Aid and Plaintiffs' relationships with Prime) to plausibly allege that Rite Aid was required under its PBM contracts to report its discount prices as its U&C prices. Persuasive authorities support this conclusion. *See Forth v. Walgreen Co.*, No. 17-cv-2246, 2018 WL 1235015, at *5 n.9 (N.D. Ill. Mar. 9, 2018) ("Plaintiffs here rely upon the industry definition of what constitutes 'usual and customary' prices. Whether such a standard exists (and what it is) is something that Plaintiffs must prove at trial, but for the purpose of assessing the viability of Plaintiffs' fraud claim, the Court must assume that such a standard exists as Plaintiffs have alleged." (internal citation omitted)); *Sheet Metal Workers Local No. 20 Welfare and Benefit Fund v. CVS Health Corp.*, 221 F. Supp. 3d 227, 238 (D.R.I. 2016) (accepting as true, at Rule 12 stage, allegation that NCPDP sets industry standards for U&C price reporting); *Stafford v. Rite Aid Corp.*, No. 3:17-cv-1340-AJB-JLB, 2018 WL 4680043, at *2 (S.D. Cal. Sept. 28, 2018) (same); *Corcoran v. CVS Health Corp.*, 169 F. Supp. 3d 970, 988 (N.D. Cal. Mar. 14, 2016) (accepting at Rule 12 stage fraud plaintiffs' allegations "that CVS created [discount] program to report misleading U&C prices in a manner that contravened industry standards"). And if there were some doubt about the Complaint's sufficiency in this regard, Eighth Circuit authorities would counsel against dismissal. These authorities excuse Plaintiffs from pleading the particular contents of contracts they don't possess and to which they haven't had access. *Ambassador Press, Inc. v. Durst Image Tech. U.S., LLC*, 949 F.3d 417, 421 (8th Cir. 2020) ("When the facts constituting the fraud are peculiarly within the

opposing party's knowledge, . . . such allegations may be pleaded on information and belief." (quoting *Drobnak v. Andersen Corp.*, 561 F.3d 778, 783–84 (8th Cir. 2009))); *see also Sheet Metal Workers*, 221 F. Supp. 3d at 231.

2

Plaintiffs' second claim is for fraudulent concealment (or, as it is sometimes called, fraudulent nondisclosure). Compl. ¶¶ 104–113. To successfully plead this claim under Minnesota law, Plaintiffs must allege facts plausibly establishing all elements of a fraud claim and "that the defendant had a legal or equitable obligation to communicate facts to a particular person and that person is entitled to the information." *Zimmerschied v. JP Morgan Chase Bank, N.A.*, 49 F. Supp. 3d 583, 595 (D. Minn. 2014) (cleaned up). As a general rule, "one party to a transaction has no duty to disclose material facts to the other party." *Graphic Comm'cns Loc. 1B Health & Welfare Fund A v. CVS Caremark Corp.*, 850 N.W.2d 682, 695 (Minn. 2014). But "special circumstances may trigger a duty to disclose material facts," and the Minnesota Supreme Court has identified "three examples of such special circumstances":

> First, a person who has a confidential or fiduciary relationship with the other party to the transaction must disclose material facts. Second, one who has special knowledge of material facts to which the other party does not have access may have a duty to disclose those facts to the other party. Third, a person who speaks must say enough to prevent the words communicated from misleading the other party.

*Id.* (citations omitted). These "examples . . . are not intended to be exclusive." *Id.*

Plaintiffs' allege that "Rite Aid had special knowledge of material facts, *i.e.*, the accurate, non-inflated U&C prices, which the Plaintiffs did not have[,]" Compl. ¶ 105, and

26

the Parties disagree regarding the plausibility of this allegation.  Rite Aid argues that its

public advertisements of the RSC Program, an example of which Plaintiffs attached to the

Complaint, render any allegation that it concealed accurate U&C prices implausible.  Defs.'

Mem. in Supp. at 25–26.  Rite Aid says, in other words, that its public advertisements gave

Plaintiffs everything they needed to access the truth, and publicly available information

cannot be the subject of a fraudulent concealment claim.  Plaintiffs say that Rite Aid's

public statements regarding the RSC Program did not enable them to verify the accuracy

of the U&C prices Rite Aid reported.

Plaintiffs (evidently) anticipated this argument in their Complaint and plausibly

allege that Rite Aid's public advertisements "provided limited information that was

insufficient to identify specific drugs eligible for discounted RSC Program prices."  Compl.

¶ 62.  Plaintiffs allege particular facts to support this assertion:

> For example, Rite Aid did not provide the National Drug Code
> ("NDC"), a 10-digit universal product identifier for
> prescription drugs dispensed in the United States.  As a specific
> example of this, the Rite Aid RSC Program price list advertised
> 90 tabs of Lisinopril 10mg for $15.99.  According to the U.S.
> Food and Drug Administration's NDC Directory, there are at
> least 24 different products sold by at least 15 different
> companies that meet this description.  Nor did Rite Aid provide
> other industry-standard drug identifiers on its RSC Program
> price list, like the Generic Product Identifier [], Generic
> Sequence Number [], or Generic Code Number [].

*Id.*  Plaintiffs also allege that Rite Aid did not publish complete lists of all drugs eligible

for discounted prices under the RSC Program and that "Rite Aid regularly revised

discounted drugs eligible for RSC Program discounts, and the quantum of discounts offered

on those drugs."  *Id.*  ¶¶ 63, 65.  In other words, Plaintiffs allege that Rite Aid's public

statements were incomplete, subject to change without notice, and therefore insufficient to reverse engineer the accurate U&C prices Rite Aid should have reported. Rite Aid does not address these specific allegations. The better conclusion is that Plaintiffs plausibly plead fraudulent concealment under Minnesota law.[8]

3

Plaintiffs' third claim is for negligent misrepresentation. Compl. ¶¶ 114–125. As Justice Chutich succinctly explained when she was on the Minnesota Court of Appeals:

> Negligent misrepresentation has the same elements as fraud, except it does not have an intent element. *Florenzano v. Olson*, 387 N.W.2d 168, 173 (Minn. 1986). Negligent misrepresentation requires that the person making the misrepresentation owes a duty of care to the person to whom the information is provided. *Smith v. Woodwind Homes, Inc.*, 605 N.W.2d 418, 424 (Minn. App. 2000). A duty of care arises when the person making representations is either "supplying information for the guidance of others in the course of a transaction in which one has a pecuniary interest, or in the course of one's business, profession or employment." *Safeco Ins. Co. of Am. v. Dain Bosworth Inc.,* 531 N.W.2d 867, 870 (Minn. App. 1995).

*Adams v. Rosensteel*, No. A13-0451, 2013 WL 6223562, at *3 (Minn. App. Dec. 2, 2013).

Though the Minnesota Supreme Court has not yet decided "whether a negligent misrepresentation claim can be brought when the alleged misrepresentation was made by one party to an arm's-length commercial transaction[,]" *Valspar Refinish, Inc. v. Gaylord's, Inc.*, 764 N.W.2d 359, 370 n.7 (Minn. 2009), the Minnesota Court of Appeals

---

[8]    Rite Aid characterizes Plaintiffs' fraud and fraudulent concealment claims as "duplicative" of each other but cites no authority that might support the dismissal of either claim on this basis. Defs.' Reply Mem. at 15.

has held repeatedly that no duty of care exists between parties to an "arm's-length commercial transaction." *Woodwind Homes*, 605 N.W.2d at 424–25; *Safeco Ins. Co.*, 531 N.W.2d at 871–73, *review denied* (Minn. July 20, 1995); *see Thompson v. Riess*, No. A18-1110, 2019 WL 510034, at *5 (Minn. App. Feb. 11, 2019), *review denied* (Minn. Apr. 24, 2019). And judges in this District uniformly have done the same. *SYT Sols, LLC v. Burger*, No. 20-cv-794 (JRT/KMM), 2021 WL 101123, at *8 (D. Minn. Jan. 12, 2021) (Tunheim, C.J.); *B. Riley FBR, Inc. v. Clarke*, No. 18-cv-2318 (NEB/BRT), 2019 WL 4242537, at *5 (D. Minn. Sept. 6, 2019) (Brasel, J.); *Ascente Bus. Consulting, LLC v. DR MyCommerce*, No. 18-cv-138 (JNE/KMM), 2018 WL 3597674, at **5–6 (D. Minn. July 26, 2018) (Ericksen, J.); *Prepared Ins. Co. v. Zags, Inc.*, No. 16-cv-1775 (DWF/SER), 2017 WL 875793, at *7 (D. Minn. Mar. 3, 2017) (Frank, J.); *Aulick v. Skybridge Americas, Inc.*, No. 14-cv-4862 (ADM/HB), 2016 WL 2733116, at *11 (D. Minn. May 10, 2016) (Montgomery, J.); *Grandoe Corp. v. Gander Mountain Co.*, No. 11-cv-0947 (PJS/FLN), 2012 WL 3430735, at *3 (D. Minn. Aug. 14, 2012) (Schiltz, J.); *Stephenson v. Deutsche Bank AG*, 282 F. Supp. 2d 1032, 1061–62 (D. Minn. 2003) (Kyle, J.); *see also Kellogg Square P'ship v. Prudential Ins. Co. of Am.*, 63 F.3d 699, 703 (8th Cir. 1995) (same).

A federal district court applying Minnesota law is bound by the decisions of the Minnesota Supreme Court. *Minn. Supply Co. v. Raymond Corp.*, 472 F.3d 524, 534 (8th Cir. 2006). "When a state's highest court has not decided an issue, it is up to this court to predict how the state's highest court would resolve that issue." *Cont'l Cas. Co. v. Advance Terrazzo & Tile Co.*, 462 F.3d 1002, 1007 (8th Cir. 2006). When the decisions of a state's intermediate appellate court present "the best evidence of what state law is," those

decisions constitute persuasive authority that should be followed. *Id.* It's true that following even a settled line of Minnesota Court of Appeals cases doesn't guarantee getting it right. *See Savanna Grove Coach Homeowners' Ass'n v. Auto-Owners Ins. Co.*, No. 19-cv-1513 (ECT/TNL), 2020 WL 3397312, at *3 (D. Minn. June 19, 2020) (noting the Minnesota Supreme Court's recent rejection of an established "line of Minnesota Court of Appeals cases holding that the Uniform Arbitration Act governs appraisal awards"). Regardless, the line of cases here from the Minnesota Court of Appeals, the Eighth Circuit, and this District, is just too established not to follow.

This principle requires dismissal of Plaintiffs' negligent misrepresentation claim. Rite Aid argues (correctly) that it owed no duty to Plaintiffs for purposes of a negligent misrepresentation claim because "Plaintiffs, the PBMs, and Rite Aid were all sophisticated business entities engaged in arm's length business transactions[.]" Defs.' Mem. in Supp. at 28. Plaintiffs plead no facts in their Complaint suggesting that their relationship with Rite Aid was not arm's-length. Nor do Plaintiffs argue for a different interpretation of Minnesota law or identify facts plausibly suggesting that the no-duty-in-an-arm's-length-transaction rule should not apply here. Instead, Plaintiffs rely on factually similar cases in which courts allowed negligent misrepresentation claims to proceed. Pls.' Mem. in Opp'n at 27–28 (citing *Stafford*, 2018 WL 4680042, at **2–4; *Josten v. Rite Aid Corp.*, No. 18-cv-0152-AJB-JLB, 2018 WL 6062415, at **2–3 (S.D. Cal. Nov. 20, 2018); and *Sheet Metal Workers*, 221 F. Supp. 3d at 238–39). These cases do not support Plaintiffs. None addresses Minnesota law. None addresses this legal rule under the analogous law of some

other state.  Rite Aid's motion will therefore be granted with respect to Plaintiffs' negligent misrepresentation claim.

4

Plaintiffs' fourth (and final) claim is for unjust enrichment.  Compl. ¶¶ 126–134. To state an unjust enrichment claim, the Plans must allege Rite Aid "has knowingly received or obtained something of value for which [it] in equity and good conscience should pay."  *ServiceMaster of St. Cloud v. GAB Bus. Servs., Inc.*, 544 N.W.2d 302, 306 (Minn. 1996) (internal quotation marks omitted); *see Dahl v. R.J. Reynolds Tobacco Co.*, 742 N.W.2d 186, 195–96 (Minn. Ct. App. 2007), *review denied* (Minn. Jan. 20, 2009).  As an equitable remedy, unjust enrichment "does not apply when there is an enforceable contract" governing the parties' relationship.  *Caldas v. Affordable Granite & Stone, Inc.*, 820 N.W.2d 826, 838 (Minn. 2012); *U.S. Fire Ins. Co. v. Minn. State Zoological Bd.*, 307 N.W.2d 490, 497 (Minn. 1981).  Unjust enrichment "rest[s] on notions of justice and fairness rather than on any actual agreement between the parties[.]"  *O'Brien & Wolf, LLP v. S. Cent. Minn. Elec. Workers' Fam. Health Plan*, 923 N.W.2d 310, 316 (Minn. Ct. App. 2018).

Plaintiffs plead a plausible unjust-enrichment claim.  They allege that "Rite Aid fraudulently inflated the U&C prices it reported on millions of claims submitted" to Plaintiffs' PBMs, causing Plaintiffs to overpay "hundreds of millions of dollars to Rite Aid," Compl. ¶ 128; that "Rite Aid knowingly and voluntarily accepted these hundreds of millions of dollars in overpayments," *id.* ¶ 129; and that Rite Aid was "unjustly enriched

at the expense of" Plaintiffs, *id.* ¶ 133.  Each of these allegations is supported by more particular allegations elsewhere in the Complaint.

Rite Aid's challenge to Plaintiffs' unjust-enrichment claim is not persuasive.  It depends to an extent on an already-rejected argument Rite Aid advanced to challenge Plaintiffs' fraud claims.  Specifically, Rite Aid argues that without allegations concerning the U&C-price-related content of its contracts with Plaintiffs' PBMs, Plaintiffs cannot plausibly establish "that there was anything 'unjust' about Rite Aid's conduct."  Defs.' Mem. in Supp. at 29.  Not so.  *Supra* at 23–26 (rejecting this argument in the context of Plaintiffs' fraud claim).  Rite Aid hints at a variation on this argument when it cites the rule that an unjust enrichment claim is not plausible "<u>when there is an enforceable contract that is applicable</u>."  Defs.' Mem. in Supp. at 30.  This argument too is flawed.  Plaintiffs assert no contract claim, so it's not as if Plaintiffs' allegations are somehow self-defeating.[9]  To the contrary, Plaintiffs allege that non-contractual authorities determine (or at least bear on) Rite Aid's U&C-price-reporting obligations.  And Rite Aid has filed no "contract that is applicable."  *Id.*  Accepting this argument, then, would require concluding (once and for all) that Plaintiffs' claims are controlled exclusively by Rite Aid/PBM contracts to which Plaintiffs weren't parties and that we haven't seen.  That would be incorrect at any stage of litigation, but it would be especially dubious at the Rule 12(b)(6) stage.  *See Motley v. Homecomings Fin., LLC*, 557 F. Supp. 2d 1005, 1013–14 (D. Minn. 2008).

---

[9]     Had Plaintiffs asserted a contract claim, they could have pleaded an unjust enrichment claim in the alternative. *Gisairo v. Lenovo (United States) Inc.*, No. 19-cv-2727 (WMW/LIB), 2021 WL 352437, at *8 (D. Minn. Feb. 2, 2021).

B

Rite Aid argues that all of Plaintiffs' claims must be dismissed because they are barred by Minnesota's independent-duty rule.  Under this rule, "when a contract defines a relationship between two parties, a plaintiff is not entitled to recover tort damages save for exceptional cases in which a breach of contract 'constitutes or is accompanied by an independent tort.'"  *Russo v. NCS Pearson, Inc.*, 462 F. Supp. 2d 981, 994 (D. Minn. 2006) (quoting *Wild v. Rarig*, 234 N.W.2d 775, 789–90 (Minn. 1975)).  "A fraud claim independent of the contract is actionable, but it must be based upon a misrepresentation that was outside of or collateral to the contract, such as many claims of fraudulent inducement." *AKA Dist. Co. v. Whirlpool Corp.*, 137 F.3d 1083, 1086 (8th Cir. 1998); *see, e.g.*, *McDonald v. Johnson & Johnson*, 776 F.2d 767, 770–71 (8th Cir. 1985).

Though "courts repeatedly have granted motions to dismiss tort claims barred by the rule," *U.S. Bank Nat'l Ass'n v. San Antonio Cash Network*, 252 F. Supp. 3d 714, 720 (D. Minn. 2017) (collecting cases), dismissal on this basis would not be appropriate here. Rite Aid's reliance on Minnesota's independent-duty rule is really just another way of saying that Rite Aid's U&C-price liability is governed exclusively by its contracts with Plaintiffs' PBMs.  This is how Rite Aid describes the argument.  Rite Aid says "the price that [it] is required to report as its U&C price is dictated by [its] contracts with the PBMs" and that these "contracts control over any inconsistent 'industry standards.'"  Defs.' Mem. in Supp. at 35–36.  This argument is not persuasive for reasons explained already: the lack of citations to supporting legal authority; the non-submission and resulting unavailability of the Rite Aid/PBM contracts; Plaintiffs' plausible allegations that the Rite Aid/PBM

33

contracts required U&C-price reporting as Plaintiffs define the term; and Plaintiffs' plausible allegations that extra-contractual information bears on Rite Aid's U&C-price reporting obligations. The bottom line is that Plaintiffs assert no contract claim, and it's far too early to conclude as a matter of law that the Rite Aid/PBM contracts completely define the relationship between Plaintiffs and Rite Aid insofar as the U&C-price question is concerned.

C

Rite Aid seeks dismissal of Plaintiffs' claims predating June 30, 2011. Rite Aid says that Plaintiffs have failed to allege facts plausibly showing that earlier claims are timely under a six-year limitations period in Minn. Stat. § 541.05. Understanding this argument requires some explanation. Why Minn. Stat. § 541.05? Though "Rite Aid does not concede Minnesota's statute of limitations should apply and reserves its rights," Rite Aid and Plaintiffs agree for purposes of this aspect of Rite Aid's motion that this is the longest potentially applicable limitations period. Defs.' Mem. in Supp. at 31; Pls.' Mem. in Opp'n at 32. Then why June 30, 2011? After all, for purposes of the limitations period in Minn. Stat. § 541.05, this action was commenced on service, *Larsen v. Mayo Med. Ctr.*, 218 F.3d 863, 867–68 (8th Cir. 2000) (citing *Walker v. Armco Steel Corp.*, 446 U.S. 740, 750–52 (1980); Minn. R. Civ. P. 3.01), and Plaintiffs served the complaint on August 13, 2020. Summons Returned Executed at 1 [ECF No. 20]. Six years before is August 13, 2014. Why not that date? The answer is that "[f]or purposes of this motion, Rite Aid will not dispute Plaintiffs' assertion that the statutes of limitations for their claims were tolled by the filing of the putative class action *Stafford, et al. v. Rite Aid Corp.*, No. 3:17-cv-1340

34

(S.D. Cal.) on June 30, 2011, pursuant to *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974)." Defs.' Mem. in Supp. at 31, n.14. All of this ordinarily would mean that any claims Plaintiffs might assert that pre-date June 30, 2011, would be untimely and should be dismissed.

Plaintiffs advance two related arguments to save these claims. First, Plaintiffs argue that a discovery rule governs the commencement of the limitations period with respect to their fraud and fraudulent concealment claims, and Plaintiffs say they allege facts plausibly showing that they could not have discovered Rite Aid's (alleged) fraud until the unsealing of a federal False Claims Act lawsuit, *United States ex rel. Rahimi v. Rite Aid Corp.*, No. 2:11-cv-11940 (E.D. Mich.), on January 19, 2017. Second, Plaintiffs argue that they allege facts plausibly satisfying Minnesota's fraudulent concealment doctrine, thus tolling the limitations period with respect to their negligent-misrepresentation and unjust-enrichment claims. Pls.' Mem. in Opp'n at 32–38.

Similar principles govern the discovery rule and fraudulent concealment doctrine; both require a plaintiff to show that claim-creating facts could not have been discovered by "reasonable diligence." Under Minnesota law, an action "for relief on the ground of fraud" must be commenced within six years, and "the cause of action shall not be deemed to have accrued until the discovery by the aggrieved party of the facts constituting the fraud." Minn. Stat. § 541.05, subd. 1(6). "Discovery" does not mean discovery-in-fact. Instead, "facts constituting the fraud are deemed to have been discovered when, with reasonable diligence, they could and ought to have been discovered." *Bustad v. Bustad*, 263 Minn. 238, 242 (1962) (quoting *First Nat'l Bank of Shakopee v. Strait*, 71 Minn. 69, 72 (1898));

*Klehr v. A.O. Smith Corp.*, 87 F.3d 231, 235 (8th Cir. 1996); *Kassan v. Kassan*, 400 N.W.2d

346, 349 (Minn. Ct. App. 1987).   Fraudulent concealment has been described as "a

somewhat amorphous doctrine." *JJ Holand Ltd. v. Fredrikson & Byron, P.A.*, No.

12-cv-3064 (ADM/TNL), 2013 WL 3716948, at *5 (D. Minn. July 12, 2013) (citing *Wild

v. Rarig*, 234 N.W.2d 775, 795 (Minn. 1975)).   Regardless, courts have identified some

reasonably clear principles:

> To establish fraudulent concealment, a plaintiff must prove
> there was an affirmative act or statement which concealed a
> potential cause of action, that the statement was known to be
> false or was made in reckless disregard of its truth or falsity,
> and that the concealment could not have been discovered by
> reasonable diligence.

*Haberle v. Buchwald*, 480 N.W.2d 351, 357 (Minn. Ct. App. 1992) (citations omitted); *see

also Block v. Toyota Motor Corp.*, 795 F. Supp. 2d 880, 887 (D. Minn. 2011) ("Fraudulent

concealment requires that 'the concealment must be fraudulent or intentional and, in the

absence of a fiduciary or confidential relationship, there must be something of an

affirmative nature designed to prevent, and which does prevent, discovery of the cause of

action.'" (quoting *Wild*, 234 N.W.2d at 795)).   "[F]raudulent concealment for tolling

purposes, [must] be pleaded with particularity" under Rule 9(b).   *Great Plains Tr. Co. v.

Union Pac. R.R. Co.*, 492 F.3d 986, 995 (8th Cir. 2007) (citations omitted); *see also JJ

Holand*, 2013 WL 3716948, at *5 ("Because fraudulent concealment invokes fraud, the

heightened pleading requirements of Rule 9 apply." (citations omitted)).

Plaintiffs allege facts they say plausibly establish both that they could not have

discovered, and that Rite Aid fraudulently concealed, Rite Aid's fraudulent U&C-price

36

reporting. Plaintiffs allege that "Rite Aid used its marketing of the RSC Program to conceal the fraudulent scheme" by characterizing the program as "'exclusive'" and limited when it was in fact "free and . . . available to the general public." Compl. ¶ 74. Plaintiffs allege that they lacked access to information necessary to determine Rite Aid's correct U&C prices, *id.* ¶¶ 75–77, and that "Rite Aid repeatedly has refused requests made by third-party payors like Plaintiffs to produce relevant cash pricing transaction data necessary to validate Rite Aid's reported U&C prices[,]" *id.* ¶ 79. Plaintiffs also allege that Rite Aid "frequently, and without providing any notice to Plaintiffs, changed its RSC Program's scope and prices" with the intention of concealing the scheme. *Id.* ¶ 85.

Rite Aid argues that Plaintiffs' allegations are insufficient to plausibly show that Plaintiffs could not have discovered the alleged fraud with reasonable diligence, but the better conclusion is that Plaintiffs have alleged enough. Rite Aid points out that RSC Program marketing materials attached as an exhibit to the Complaint conspicuously describe the program as "FREE," *id.*, Ex. A at 2 [ECF No. 1-1], suggesting at least that any reasonably sophisticated business in Plaintiffs' position would have inquired concerning the relationship between the RSC Program and Rite Aid's U&C-price reporting. This seems like the start of a persuasive argument. It doesn't end the reasonable-diligence question for three reasons: (1) The cited brochure is a version from March 1, 2016, *id.* at 12, and it is not clear how a document publicized on that date enabled (or should have prompted) a reasonably diligent inquiry of claims preceding June 30, 2011. If that's not the right way to think about the issue, Rite Aid does not explain how the document's publication date bears on the reasonable-diligence question or its limitations argument

37

more broadly.  (2) Plaintiffs allege that Rite Aid "refused requests" for data to verify its U&C-price reporting, Compl. ¶ 79, permitting the plausible inference that diligent inquiry would have been unproductive.  (3) Though the gist of Rite Aid's argument—*i.e.*, that any pharmacy's public, widely advertised discount program should have prompted any third-party payor concerned about U&C prices to inquire—is persuasive in the abstract, concluding this is the only plausible characterization of the facts would violate Rule 12(b)(6)'s command that a plaintiff's well-pleaded fact allegations must be accepted as true.  *Barry v. Barry*, 78 F.3d 375, 380 (8th Cir. 1996) ("The question of when discovery could or should have reasonably been made is one of fact.") (citing *Est. of Jones v. Kvamme*, 449 N.W.2d 428, 431 (Minn. 1989)).  Rite Aid also points out that Plaintiffs identify allegedly overpaid claims from 2009 (predating June 30, 2011) in an exhibit to the Complaint.  Compl., Ex. 2 [ECF No. 1-2].  Rite Aid says that "Plaintiffs were equally capable of performing this analysis in 2009, when those claims were originally submitted, as they were in January 2017."  Defs.' Mem. in Supp. at 34.  This is not persuasive.  The exhibit Rite Aid relies on identifies a comparatively small number of examples; it is not close to being complete or thorough.  Never mind Plaintiffs' discovery-rule and fraudulent-concealment allegations, Plaintiffs' allegations plausibly permit the inference that they continue (today) to lack information necessary to reverse engineer U&C prices Rite Aid should have reported.  Compl. ¶¶ 62–65.  On a more basic level, the mere fact that Plaintiffs were able to compile this information today says nothing about whether they were able to compile (or discover) this information over a decade ago.  Finally, the federal district court's determination that the federal False Claims Act's public-disclosure bar was met in

*U.S. ex rel. Rahimi*, 2019 WL 10374285, at **2–5 (E.D. Mich. Dec. 12, 2019), does not resolve the discovery-rule and fraudulent-concealment questions here.  The law governing the False Claims Act's public-disclosure bar, and the facts that prompted the court to determine it had been met in that case for purposes of establishing its subject-matter jurisdiction, are quite different and removed from the law and factual allegations relevant here to Rite Aid's Rule 12(b)(6) motion.

## ORDER

Based on all the files, records, and proceedings herein, **IT IS ORDERED THAT** Defendants' Motion to Transfer Venue and in the Alternative Dismiss [ECF No. 42] is **GRANTED IN PART** and **DENIED IN PART** as follows:

1.  Defendants' motion to dismiss for failure to state a claim is **GRANTED** with respect to Count III of the Complaint.  Count III is **DISMISSED** with prejudice.

2.  Defendants' motion is **DENIED** in all other respects.

Dated:  February 9, 2021                           s/ Eric C. Tostrud
                                                   Eric C. Tostrud
                                                   United States District Court