# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| Blue Cross and Blue Shield of North Carolina, Blue Cross and Blue Shield of Alabama, Cambia Health Solutions, Inc., Asuris Northwest Health, Regence BlueShield of Idaho, Inc., Horizon Healthcare Services, Inc., Horizon Healthcare of New Jersey, Inc., Regence BlueCross BlueShield of Oregon, Regence BlueCross BlueShield of Utah, Regence BlueShield of Washington, Blue Cross Blue Shield of North Dakota, BCBSM, Inc., HMO Minnesota,<br><br>Plaintiffs,<br><br>v.<br><br>Rite Aid Corp., Rite Aid Hdqtrs. Corp.,<br><br>Defendants. | Case No. 0:20-cv-1731 (ECT/HB)<br><br><br><br><br><br>**ORDER ON MOTION TO COMPEL** |

This matter is before the Court on Plaintiffs' Motion to Compel Defendants'

Production of Documents [ECF No. 96], which seeks to compel Defendants to produce

documents in response to Plaintiffs' Requests for Production Nos. 11, 15, 16, and their

Interrogatory No. 4.  For the reasons described below, the Court will grant the motion in

part.

## I.    BACKGROUND

### A.    The Parties and the Complaint

Plaintiffs are a number of Blue Cross Blue Shield entities that "provide[] a full

spectrum of health care plans and services to . . . [individual] members." (Compl. ¶¶ 9–19

[ECF No. 1].)  Rite Aid is "one of the largest retail drugstore chains in the United States." Compl. ¶ 21.  Throughout the period relevant to the matters asserted in the Complaint, Rite Aid has been a network pharmacy for each of the Plaintiffs, such that "Plaintiffs' [m]embers can use their prescription drug benefit to fill their prescriptions at Rite Aid pharmacy locations at in-network pricing." *Id.* ¶ 23.

The relationship between Plaintiffs and Rite Aid is indirect; positioned between Plaintiffs and Rite Aid are pharmacy benefit managers (or "PBMs").  *Id.* ¶¶ 23, 50.  Each Plaintiff contracts with one or more PBMs "to adjudicate and administer prescription benefits with a network of pharmacies on their behalf."  *Id.* ¶ 48.  "When a health plan employs the services of a PBM, instead of submitting claims directly to the health plan, the retail pharmacy submits claims for payment from the health plan to the health plan's chosen PBM."  *Id.*  Rite Aid also contracts with PBMs as a part of maintaining its network relationship with Plaintiffs.  See *id.* ¶ 37.  In other words, when Rite Aid submits a claim to a PBM for reimbursement by a health plan, Rite Aid does so under a contract between it and the PBM.  *Id.*

The price Plaintiffs pay Rite Aid, through the PBM, for a prescription drug purchased by one of Plaintiffs' members is the lesser of a negotiated price or the drug's "usual and customary" ("U&C") price.  *Id.* ¶¶ 1–2, 38, 43, 50(c).  The Complaint concisely describes the process by which Rite Aid's prescription-drug charges go through PBMs and reach Plaintiffs for payment, *id.* ¶ 50: (1) One of Plaintiffs' members "presents a prescription at a Rite Aid pharmacy . . . and purchases the corresponding prescription drug, less the share of the purchase price covered by the [m]ember's prescription drug

benefit." *Id*. ¶ 50(a).  (2) "Rite Aid then reports to the Plaintiff's PBM the data associated with the sale, including the U&C charge for the drug it dispensed[.]" *Id*. ¶ 50(b).  (3) If the U&C price Rite Aid reported is greater than the negotiated price, then a "Plaintiff pays, through its PBM, the negotiated price to Rite Aid." *Id*.  If the reported U&C price is less than the negotiated price, then a Plaintiff pays, through its PBM, the reported U&C price. *Id*.

How the U&C price is determined, however, is at the heart of this lawsuit. Plaintiffs allege that the U&C price is "generally defined as the cash price to a member of the general public paying for a prescription drug without insurance." *Id*. ¶ 1; see also *id*. ¶¶ 30–31.  Some of the Plaintiffs' contracts with PBMs explicitly required that discounts—or at least some discounts—given by network pharmacies like Rite Aid be included in the determination of a prescription drug's U&C price. *Id*. ¶¶ 35(b), (e), (h), (i).  But Plaintiffs allege more broadly that whenever a drug is sold at a discount to some uninsured people, "the true U&C price" is the lowest price for which a prescription drug is "widely and consistently available[.]" *Id*. ¶ 69.

In or around September 2008, Rite Aid implemented a nationwide prescription drug discount program, known as the Rx Savings Card Program ("RSP"), in reaction to competition from big-box retail stores. *Id*. ¶¶ 3, 5, 55–57.  "The [RSP] offers steeply discounted prices on thousands of widely prescribed generic and brand drugs to customers who paid for their prescriptions without using insurance." *Id*. ¶ 60.  Plaintiffs' central allegation in this action is that Rite Aid knowingly did not report those discounted prices as U&C prices, and that as a result, it "systematically misrepresented its U&C

charges—the cash price uninsured customers pay for prescription drugs—to Plaintiffs and other payers." *Id*. ¶ 54; see also *id*. ¶¶ 5–6, 54–72. Plaintiffs allege that even though the volume of Rite Aid's cash sales under the RSP and other similar programs "far exceeded" its sales to uninsured, cash-paying customers at non-discounted prices, the U&C prices reported by Rite Aid "were paid by few—if any—actual cash customers, and were regularly five, ten, or even twenty times higher than what Rite Aid actually charged cash customers without insurance." *Id*. ¶ 6; see also *id*. ¶¶ 66, 68. As a result, "[f]or many millions of transactions, Rite Aid caused Plaintiffs to pay Rite Aid the negotiated price because the negotiated price was lower than the reported inflated U&C price." *Id*. ¶ 69. Plaintiffs allege that since the inception of the RSP program in September 2008, Rite Aid has submitted to Plaintiffs, through Plaintiffs' PBMs[1], more than 37 million retail pharmacy claims for payment, for which Rite Aid was reimbursed more than $1.8 billion. *Id*. ¶ 71. Plaintiffs allege they were consequently overcharged "hundreds of millions of dollars." *Id*. ¶ 8. The Complaint asserted causes of action for fraud, fraudulent concealment, unjust enrichment, and negligent misrepresentation. (Compl. at 35–42.)

Rite Aid moved to dismiss the Complaint in its entirety (Mot. Dism. [ECF No. 42]), arguing, *inter alia,* that Rite Aid's obligations with regard to reporting U&C prices were governed by the terms of its contracts with the PBMs. *Id.* at 1. Therefore, it argued, so long as it was reporting what its contracts with Plaintiffs' PBMs required of it, it could not have been falsely representing or fraudulently concealing information about

---

[1] As used herein, "Plaintiffs' PBMs" refers to the PBMs that adjudicated the claims of Plaintiffs' members.

U&C pricing.  *Id.* at 1–2, 19–30.  The Honorable Eric C. Tostrud, United States District Judge, granted Rite Aid's motion as to Plaintiffs' claim of negligent misrepresentation, but denied the motion as to the claims for fraud, fraudulent concealment, and unjust enrichment.  (Order Mot. Dism. [ECF No. 66].)

In so doing, Judge Tostrud noted that "[u]nanswered questions abound," including not only the specific terms of the contracts with the PBMs (which were not before the court), but also whether it would matter if "a contract's relevant terms contradicted industry standards [or] government guidance."  (Ord. Mot. Dism. at 23, n. 6.)  Judge Tostrud went on to observe that in the face of Plaintiffs' allegations "that non-contractual authorities determine (or at least bear on) Rite Aid's U&C-price-reporting obligations" and in the absence in the record of any "contract that is applicable," it would be "incorrect" to conclude "once and for all that Plaintiffs' claims are controlled exclusively by Rite Aid/PBM contracts to which Plaintiffs weren't parties and that we haven't seen."  (*Id.* at 32.)  He concluded in the context of the motion to dismiss that Rite Aid's insistence on its position that its liability for U&C price reporting was governed exclusively by its contracts with Plaintiffs' PBMs was "not persuasive" for several reasons, including "Plaintiffs' plausible allegations that extra-contractual information bears on Rite Aid's U&C-price-reporting obligations."  (*Id.* at 34.)  Thus, he concluded, where Plaintiffs assert no contract claim, it was "far too early to conclude as a matter of law that the Rite Aid/PBM contracts completely define the relationship between Plaintiffs and Rite Aid insofar as the U&C-price question is concerned."  (*Id.* at 33-34.)

**B.     The Current Discovery Dispute**

The current motion focuses on Rite Aid's responses to Plaintiffs' Requests for

Production Nos. 11, 15, and 16, and Interrogatory No. 4.  Those requests sought

information about claims submissions, U&C charges, and pharmacy discount programs

involving Rite Aid and third-party payers (TPPs) other than Plaintiffs, and/or PBMs other

than the PBMs involved in the contracts with Rite Aid that related to Plaintiffs, and

information relating to litigation and government investigations and inquiries alleging

fraud or related torts involving Rite Aid's RSP.  Plaintiffs served the discovery requests

on May 21, 2021, and Rite Aid responded on June 21, 2021.  (Ruby Exs. A–D [ECF Nos.

99-1 – 99-4].)  Following meet-and-confers about the sufficiency of Rite Aid's responses

to these and other requests, Rite Aid served revised responses on December 1, 2021.

(Ruby Exs. E–G, L, P [ECF Nos. 99-5 – 99-7, 99-12, 99-16].)  Further meet-and-confers,

both before and after a pre-motion conference call with the Court, failed to resolve

several issues, giving rise to the present motion.  (Ruby Exs. H–J, M–N, T [ECF Nos. 99-

8 – 99-10, 99-13 – 99-14, 99-20]; Ableson Ex. B [ECF No. 104-2].)

Plaintiffs move to compel Rite Aid to "(1) produce communications between it

and other [TPPs] or PBMs related to claim submissions, reported U&C charges, or

discount programs in response to Plaintiffs' Request for Production No. 11; (2) provide

information related to other litigations also accusing the Rx Savings Program of fraud

and related torts in response to Plaintiffs' Requests for Production Nos. 15 and 16 and

Interrogatory No. 4; and (3) identify any governmental investigations addressing its

fraudulent Rx Savings Program and to produce any documents related to the identified

6

investigations in response to Interrogatory No. 4 as well as Requests for Production Nos.

15 and 16." (Pls' Motion [ECF No. 96].)

Specifically, Request No. 11 sought:

> All Communications between [Rite Aid] and any TPP other than Plaintiffs related to (1) any Claim Submissions, (2) any Reported U&C Charge, or (3) any Discount Program from January 1, 2007 to the present.

(Ruby Ex. A at 13.) Pertinent here, Plaintiffs defined the following terms used in this

request:

> "**Retail Program(s)**" or "**Discount Program(s)**" means program(s) offered by Retail Pharmacies under which the Retail Pharmacies charge discount prices in prescription drug transactions involving customers who pay without using insurance, including but not limited to the Rx Savings Card Program, the Rx Transfer Coupon program, and the Wellness65+ program.
>
> '**Third-Party Payor**' or '**TPP**' means any public or private third-party payor or other Person that pays or insures health or medical expenses including prescription drugs on behalf of beneficiaries. TPPs include, for example, Medicare, Tricare, and commercial insurance companies.

(*Id.* at 5–6.)

Interrogatory No. 4 requested that Rite Aid:

> Identify and describe all Litigation relating to each Discount Program, including but not limited to (i) the date the Litigation initiated, (ii) the relevant parties, (iii) the forum, (iv) whether the Litigation has concluded and, as applicable, the associated date and the amount of any resulting damages awards, settlements, or other payments paid by or to You.

(Ruby Ex. B at 10–11.) "Litigation" was defined as "any formal or

informal adjudicatory proceeding, including but not limited to lawsuits,

7

governmental investigations, and arbitrations."  (Ruby Ex. A at 3.)

Requests Nos. 15 and 16 then sought information about the "litigations"

identified in response to Interrogatory No. 4.  Request No. 15 requested "all

Documents or Communications related" to any such litigation.  Request

No. 16 sought:

> All Documents produced or otherwise provided in any Litigation as identified in Your response to Interrogatory No. 4, including but not limited to:
>
>> a. Documents sufficient to identify any such Litigations;
>>
>> b. All requests for production, interrogatories, or civil investigative demands relating to such Litigations, including any such actual subpoenas, civil investigative demands, or document requests from any entity;
>>
>> c. Documents sufficient to identify any witnesses or custodians, disclosed and/or identified by Rite Aid or another party as having relevant testimony or documentary evidence in such Litigation;
>>
>> d. All document productions and written discovery responses produced by Rite Aid in response to discovery requests in such Litigations;
>>
>> e. Transcripts and marked exhibits from all depositions taken in such Litigations, as well as video and audio recordings of such depositions.

(Ruby Ex. A at 14–15.)

   In its revised responses, and pertinent to this motion, Rite Aid objected on the

basis of overbreadth, irrelevance, burdensomeness, and lack of proportionality to all

requests that sought information about TPPs other than Plaintiffs, PBMs other than the

PBMs involved in the relationship between Rite Aid and Plaintiffs, or discount programs

other than the RSP. (Ruby Ex. C at 2, 11, 16, 19; Ruby Ex. D at 1, 11, 17.) It also objected to the definition of "Litigation" on the ground that it was overly broad, vague, ambiguous, and unduly burdensome, particularly with respect to the word "informal," and objected to the requests for information about litigation on the additional ground that the request for "all documents" pertaining to litigation was overly broad and unduly burdensome.

Based on its objections, Rite Aid refused to produce documents in response to Request Nos. 11, 15, or 16, but otherwise agreed to produce documents that related to Plaintiffs and Plaintiffs' PBMs, and offered to meet and confer about its objections to the requests at issue. (Ruby Ex. G at 4–5, 7–8, 14–15, 17–19.) Furthermore, Rite Aid's counsel clarified during the oral argument that Rite Aid would run the parties' agreed search terms and if a document contained a discussion about the meaning of U&C or Rite Aid's obligation to report pricing for membership loyalty programs such as the RSP, that document would be produced even if it did not specifically refer to Plaintiffs or Plaintiffs' PBMs, unless it was clear that it was specific to another TPP or PBM or fee-for-service Medicaid.

As the parties' meet-and-confer process continued, Rite Aid proposed a compromise, provided it would obviate the need for motion practice:

1) As to Plaintiffs' demand for documents and communications relating to TPPs other than Plaintiffs and PBMs other than Plaintiffs' PBMs, it offered to produce responsive documents and communications relating to

a)  all of the other TPPs who contracted with Plaintiffs' PBMs, including any government payers *other than fee-for-service Medicaid programs*, and

b)  the two largest PBMs who do not contract with Plaintiffs, namely, Express Scripts and MedImpact.  As to this point, Rite Aid represented that if it were to add those two PBMs, it would be producing documents and communications concerning PBMs that, collectively, adjudicate ninety percent of all claims adjudicated by any PBM in the country.

2)  As to Plaintiffs' demand for documents produced in or relating to other lawsuits claiming fraudulent reporting or related torts concerning reporting of U&C payments, Rite Aid offered to review all documents produced in other U&C lawsuits to locate any documents responsive to Plaintiffs' requests for production and produce any documents that fell within the scope of its promised or adjudicated obligations to produce.

3)  As to Plaintiffs' demand for documents produced in or relating to governmental investigations, Rite Aid offered to:

a)  Disclose any formal actions (i.e., lawsuits or private arbitrations) that were commenced by any person or entity regarding U&C price reporting and the RSP;

b)  Run a broad set of search terms for any document discussing U&C price reporting or the RSP and review the resulting "hits", which would assist

in identifying any "informal" governmental investigation relevant to

Plaintiffs' allegations; and

c) Undertake a "good faith but reasonable" investigation as to whether

there was any "informal" governmental investigation that would bear on

the U&C price-reporting to Plaintiffs' PBMs for Plaintiffs' members

and, if any, review any document productions for responsive to

Plaintiffs' requests.

(Defs' Mem. at 4–5, and n. 5.)

Plaintiffs liked the compromise proposals, but with two important and, ultimately,

deal-breaking exceptions:  Plaintiffs insisted that documents pertaining to fee-for-service

Medicaid programs must be included, and they would not agree to forgo an eventual

motion to compel after receiving the results of the promised production.  (*Id.* at 6;

Ableson Ex. B [ECF No. 104-2].)  When Rite Aid refused to budge on either of those

conditions, this motion followed.  (Ableson Ex. B.)  In response, Rite Aid maintains that

the scope of its revised responses is reasonable and proportionate, and argues that the

Court should not adopt even the compromise proposal, as in Rite Aid's view it went

above and beyond Rite Aid's obligations under the rules and was contingent upon

avoiding motion practice.

## II.    STANDARD OF REVIEW

"Discovery on a matter is permissible if it is (1) 'relevant to any party's claim or

defense' and (2) 'proportional to the needs of the case.'"  *Baker v. Cenlar FSB*, No. 20-

CV-0967 (JRT/HB), 2021 WL 2493767, at *3 (D. Minn. June 18, 2021) (quoting Fed. R.

Civ. P. 26(b)(1)).  The factors courts consider in their analysis of proportionality include "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."  *Id*.

"Once the party seeking the discovery has made a threshold showing of relevance, the court generally looks to the party resisting discovery to show specific facts demonstrating lack of relevancy or undue burden."  *Id*. (citing *Inline Packaging, LLC v. Graphic Packaging Int'l, Inc.*, No. 15-CV-3183 (ADM/LIB), 2016 WL 6997113, at *7 (D. Minn. Sept. 6, 2016)).  That said, ultimately it is "[t]he court's responsibility, using all the information provided by the parties, [] to consider [the proportionality factors] in reaching a case-specific determination of the appropriate scope of discovery," irrespective of how the evidence is ultimately brought forward.  *Id.* (quoting Fed. R. Civ. P. 26(b)(1) advisory committee's note to 2015 amendment) (third alteration in original).

## III.   DISCUSSION

### A.   Whether Discovery Into Information Relating to TPPs Other Than Plaintiffs and PBMs Other Than Plaintiffs' PBMs in Response to Request No. 11 Is Relevant and Proportional to the Needs of the Case

As noted, Rite Aid interposed additional objections that were particular to the specific requests, but the dispute common to all of the requests at issue here focuses on whether information that goes beyond the Plaintiffs, the PBMs involved in the relationship between Rite Aid and Plaintiffs, and the RSP discount program, is relevant and proportional to the needs of the case.  The Court therefore addresses that threshold question before turning to other request-specific objections.

Plaintiffs argue the documents they seek will show how Rite Aid fraudulently characterized the claims, U&C prices, and discount programs to all TPPs through their PBMs.  (Pls' Mem. at 10–11.)  They tie the requested information to several of the elements of those claims for fraud.  First, they argue that knowing what statements and representations Rite Aid made to other TPPs about U&C pricing would assist in proving that the statements Rite Aid made to Plaintiffs were false.  (*Id.* at 7.)  Second, they argue that evidence that TPPs other than Plaintiffs "questioned the legitimacy of Rite Aid's RSP" (such as litigation-related communications between Rite Aid and other TPPs and internal Rite Aid communications about such litigation) would be probative that Rite Aid knew its statements to Plaintiffs were false.  (*Id.*)  Third, and relatedly, Plaintiffs argue that evidence that other TPPs questioned the legitimacy of the RSP and filed lawsuits about it is probative of Rite Aid's intent to deceive.  "Rite Aid's failure to openly communicate about the RSP with not only the Plaintiffs' PBMs but PBMs throughout the

market shows that these misstatements were not merely mistakes or miscommunications but evidence of Rite Aid's pervasive intent to falsify its U&C reporting." (*Id.*)  Fourth, Plaintiffs argue that documents showing other "sophisticated TPPs were similarly deceived by Rite Aid's fraudulent U&C reporting" is probative that Plaintiffs' reliance on Rite Aid's misstatements was reasonable.  (*Id.*)  Fifth, they contend that data produced in other litigation on the issue of damages may be relevant to Plaintiffs' proof of damages caused by Rite Aid's fraud here because Rite Aid has not yet produced in this case the data that Plaintiffs will need to create a reliable damages model.  (*Id.* at 7–8.)

Plaintiffs also argue the scope of discovery they request is relevant to show whether industry standards required Rite Aid to report the RSP prices as its U&C prices. (*Id.* at 12.)  Plaintiffs explain, "[t]hose standards are reflected throughout the industry in contract definitions of U&C, regulatory definitions of U&C, provider and pharmacy manuals, and in guidance documents."  (*Id.*)

Finally, Plaintiffs urge that they need information regarding communications outside the contractual relationships at issue here because in opposition to the motion to dismiss in this case, Rite Aid cited declarations filed by PBMs in other federal cases stating PBMs generally did not expect Rite Aid to report RSP prices as U&C prices. (*Id.* at 13.)  Plaintiffs argue that if Rite Aid thought the expectations of PBMs generally were relevant in that context, it cannot now be heard to argue the contrary.  Moreover, Plaintiffs note, to the extent Rite Aid intends to rely on similar declarations going forward, Plaintiffs are entitled to discover all communications between Rite Aid and

14

those other PBMs about those topics to assess the accuracy and truthfulness of the declarations.  (*Id.* at 13–14.)

Rite Aid counters that the meaning of "U&C price" was set by contracts negotiated separately with each of the Plaintiffs' PBMs, so the viability of Plaintiffs' claims for fraud depends entirely on the interpretation of each of those contracts and what Rite Aid understood about them, not on Rite Aid's contracts or communications with other PBMs and other TPPs.  (Defs' Mem. at 13–17 [ECF No. 102].)  Rite Aid cites the declaration of Christopher Moen (Moen Decl. [ECF No. 103]), a Rite Aid executive with more than 20 years of pharmacy industry and PBM experience and oversight over Rite Aid employees responsible for negotiating contracts with PBMs.  (Moen Decl. ¶¶ 1–7, 24.)  Moen states that Rite Aid contracts directly with PBMs to determine what price to report as U&C, and that it entered into separate contracts with each of Plaintiffs' seven PBMs, each of which had its own definition of U&C.  (*Id.* ¶¶ 12, 14–15.)

As to private TPPs other than Plaintiffs, Rite Aid similarly argues that communications involving the claims of those TPPs' members, as well as those TPPs' "confidential trade secret contractual relationships, either with Rite Aid or any PBMs," are irrelevant to the litigation.  (Defs' Mem. at 4, 13–19.)  But Rite Aid takes particular, although not exclusive, issue with Plaintiffs' inclusion within the scope of TPPs governmental payers in the context of fee-for-service Medicaid programs, stating that the "reimbursement terms for claims submitted to these types of payers are defined by unilaterally imposed regulations and statutes, as opposed to bilaterally negotiated private contracts like those entered into by Rite Aid and Plaintiffs' PBMs . . . [so] claims

submitted to government payers [are not] relevant to Rite Aid's U&C reporting obligations to Plaintiffs' PBMs." (*Id.* at 4, 23–27.)

To Plaintiffs' argument that these communications may show industry custom and practice that could be relevant to their claims, Rite Aid responds that the seven entities comprising Plaintiffs' PBMs already include some of the largest PBMs in the marketplace and their communications should be sufficient for Plaintiffs and their experts to distill any industry standard because just three of Plaintiffs' seven PBMs handle 61% of the claims submissions market in the U.S. and 47.5% of Rite Aid's claims in 2021. (Defs' Mem. at 18–19; Moen Decl. ¶¶ 18–20.)[2]

Finally, Rite Aid makes two points in response to Plaintiffs' concern that Rite Aid has already relied in this case on declarations from employees of other PBMs about their expectations regarding U&C reporting and has therefore opened the door to inquiry into communications and information about other PBMs. First, Rite Aid points out that the declarations were from former employees of *Plaintiffs' PBMs*, submitted for the purpose of describing the expectations of their former employers about U&C price reporting. (Defs' Mem. at 17–18.) Second, it argues that it has already agreed that it will apply broad agreed search terms to the various custodians and produce any communications it

---

[2] Rite Aid also argues that Plaintiffs do not need the discovery requested to prove the existence of an industry standard because such evidence is typically presented in expert testimony, not through an accretion of communications. (Defs' Mem. at 18–19.) But the case it cites for support, *Walmart Inc. v. Cuker Interactive, LLC*, 949 F.3d 1101, 1113–14 (8th Cir. 2020), did not hold that evidence of an industry standard begins and ends with expert opinion; it merely observed that "courts routinely allow contract experts to testify regarding the meaning of contract terms . . . depend[ing] on trade practice." *Id.* As Plaintiffs note, the experts still need facts about the industry upon which to rely.

locates that speak about the U&C reporting obligation in non-specific terms, even if not explicitly tied to one of Plaintiffs' PBMs, so long as it is not clearly tied to another PBM. Thus, Rite Aid argues, if it finds sweeping statements about what U&C reporting means independent of a PBM-specific reference, whether in Rite Aid's view or in the view of the industry as reflected in Rite Aid's external or internal communications, those would be produced.

Both parties support their arguments by citing an amicus brief Rite Aid filed in support of Kmart in *United States ex rel. Garbe v. Kmart Corp.*, 824 F.3d 632 (7th Cir. 2016). In that brief, Rite Aid argued that discount program prices are not U&C prices unless explicitly required by a regulation or contract. (Ruby Ex. K [ECF No. 99-11]). Plaintiffs claim the brief provides a relevant example of Rite Aid communications with a PBM that led it to accept that RSP prices should be included in its U&C reporting. (Pls' Mem. at 7.) Rite Aid counters that the referenced communications were nothing more than an example of Rite Aid and the PBM *renegotiating* the contract definition of U&C to incorporate the RSP price. (Defs' Mem. at 15.)

The Court notes at the outset that there appears to be no reasonable dispute that each contract with a PBM has its own definition of U&C price, and that definition varies from contract to contract. But Rite Aid's insistence that from this fact follows the inexorable conclusion that *only* the contractual relationships at issue in this litigation and the communications that took place within those specific relationships are relevant to the issues in this litigation ignores Judge Tostrud's decision on its motion to dismiss. Judge Tostrud's ruling clearly contemplates that the ultimate resolution of Rite Aid's

17

obligations when it came to U&C reporting to Plaintiffs' PBMs might involve consideration of extra-contractual information such as (but not necessarily limited to) "industry standards" or "government guidance." (Order Mot. Dism. at 23, n. 6.)

For their part, however, Plaintiffs read too much into Judge Tostrud's conclusion that extra-contractual information might bear on Rite-Aid's price-reporting obligations and that it was too early to "conclude as a matter of law that the Rite Aid/PBM contracts completely define the relationship between Plaintiffs and Rite Aid insofar as the U&C-price question is concerned." (Order Mot. Dism. at 23 n. 6, 34.) Plaintiffs see the order as paving the way to virtually unfettered discovery about communications, litigation, and governmental investigations, so they can search for an industry standard, governmental guidance, or some statement made by or to Rite Aid about how Rite Aid or others viewed the U&C reporting obligation in the context of some other relationship. But the order does not rule on the scope of discovery from either a relevance or a proportionality perspective, much less sanction a fishing expedition for extra-contractual information; it holds only that, at the motion to dismiss stage, the claims could not be deemed as a matter of law to rise or fall exclusively on the contract language.

Having considered the parties' arguments regarding relevance of documents and communications regarding PBMs other than Plaintiffs' PBMs and TPPs other than Plaintiffs, the Court finds that while relevant information may well lie within that expanded scope, it is skeptical about the incremental value of the information, and that skepticism increases as the scope extends farther and farther afield from Plaintiffs and their PBMs. This is especially true in view of Rite Aid's commitment to run broad

search terms and to review for documents that not only speak directly to Plaintiffs and their PBMs but also any documents that talk of U&C reporting obligations in more general terms.  While Plaintiffs argue that information and communications concerning all TPPs and PBMs would be relevant to their fraud claims, for example, their arguments are couched in attenuated "what ifs," and seem destined to lead to expensive litigation within litigation as the parties battle over the precise context in which any given statement or observation was made, even more so because of the particularized showings of knowledge and intent required for fraud.[3]

Plaintiffs' argument for evidence of industry standards is somewhat more persuasive, but only to a point.  The Court agrees with Plaintiffs that Rite Aid's argument that no such discovery is appropriate because evidence of industry standards can come only from expert testimony is unavailing.  On the other hand, Plaintiffs' PBMs account for approximately two-thirds of the claims adjudicated, again bringing into question the incremental value of additional information.

As for Plaintiffs' argument that Rite Aid has essentially "opened the door" to evidence about what other PBMs believe or expect about U&C reporting, Rite Aid pointed out the limited context in which those declarants proffered evidence, and so the Court does not find that a compelling hook on which to hang the argument for relevance.

---

[3] As for Plaintiffs' argument that Rite Aid has thus far not produced information requested and needed by their damages expert to develop their damages model, the remedy is not to seek information produced in other litigations in other contexts, but rather to complete any necessary meet-and-confer with Rite Aid to determine whether and when the information sought in *this* case will be produced, and to bring the matter to the Court if they are not satisfied with the answer.

However, Rite Aid is cautioned that should it attempt to rely in the future on evidence about the expectations or understandings of PBMs other than Plaintiffs' PBMs, it might either find itself precluded from doing so, or stepping back as the door is flung open to discovery into the communications and information about those other PBMs.

Of course, limited relevance does not mean *no* relevance, and so the Court looks at whether, to use the colloquialism, "the light is worth the candle." In other words, would the potential relevance and incremental value beyond the information Rite Aid has already promised to produce justify the incremental burden of gathering the information. Rite Aid argues it does not. (Defs' Mem. at 20–23.) Rite Aid is currently reviewing 285,695 documents for production, at the cost of hundreds of thousands of dollars, related only to Plaintiffs' and their seven PBMs. (Ableson Decl. ¶¶ 6–11 [ECF No. 104].) Rite Aid has contracted with over 100 PBMs over the relevant time period (13 years), and it contends that producing its communications with those PBMs (and all TPPs) will be a monumental review and redaction effort for additional hundreds of thousands of documents. (Defs' Mem. at 20, 23; Moen Decl. ¶ 17; Ableson Decl. ¶¶ 11–12, 24.)

Plaintiffs argue the burden of review can be mitigated using search terms and technology assisted review (TAR) methods the parties have already agreed to. (Pls' Mem. at 15–16.) Rite Aid counters, however, that the additional burden of adding dozens of PBMs goes far beyond the additional volume of documents required to be gathered, reviewed, and potentially produced. It notes that it is contractually bound to secure each PBM's consent before disclosing documents with the PBM's confidential information, making Plaintiffs' demands unworkably burdensome. (Defs' Mem. at 23.)

20

In particular, Rite Aid emphasizes the confidentiality of the relationships it has with PBMs other than Plaintiffs' PBMs, arguing that they "are governed by entirely separate, highly competitively sensitive contracts, which are subject to confidentiality provisions and trade secret protection." (Defs' Mem. at 4.)   Rite Aid contracts with more than one hundred PBMs who compete vigorously with each other.  It notes, for example, that Plaintiff owns one of the largest PBMs in the industry.  It maintains that if it were required to disclose contracts, communications, and documents relating to competing PBMs, it would have to notify each of them, potentially give the responsive documents to the PBM for its review, redact sensitive information identified by the PBM, and repeat the process until the PBM was satisfied and consented to the production or until the PBM had an opportunity to speak for itself as to the competitively sensitive nature of the information sought and whether the existing protective order is adequate to protect its interests.  (Defs' Mem. at 20–23; Ableson Decl. ¶¶ 12–15; Moen Decl. ¶¶ 22–23.)  This is a burden it recognizes it would have to shoulder for Plaintiffs' seven PBMs in any event, but which, it objects, would contribute to the disproportionate burden it if were required to produce documents concerning the rest.  (*Id.* at 19–23.)  Rite Aid also faces a burden in redacting all HIPAA-protected health information of individual claimants in the many claim submissions that would otherwise be responsive.  (Ableson Decl. ¶ 27.)

Plaintiffs argue that any burden based on disclosure of confidential information is dealt with by the Protective Order entered in this case [ECF No. 78], which allows parties to designate documents for attorneys' eyes only.  In addition, the stipulated ESI protocol

[ECF No. 85 at 9–10] allows redaction of sensitive competitive or proprietary information.  (Pls' Mem. at 14–15.)

While it is true that the Court can order the disclosure of confidential information subject to a protective order, that would not obviate Rite Aid's obligation to notify its business partners about the order, nor would the Court be inclined to ignore any concerns those entities might have about whether that information would be adequately protected by the existing Protective Order.  Therefore, the burden, both to Rite Aid and to the Court, of adding to the scope of discovery dozens more entities who may have such concerns is not an inconsequential one.  This is particularly true because while the parties to litigation are necessarily "in the loop" and able to keep an eye on how their information is being used, the same cannot be said for non-parties whose confidential information, through no action of their own, is brought into the mix.  Furthermore, while redaction might address some of the concerns, it is an imperfect solution for two reasons.  First, it takes time and money, particularly with a non-party who is not before the Court.  Second, some of the very details the non-party may wish to redact—the specifics of the contract language, for example—may be the very details needed either by Plaintiffs or by Rite Aid to analyze whether the document is or is not a useful piece of evidence about the meaning of Rite Aid's U&C reporting obligations.

Taking all of these considerations into account, along with the other proportionality factors, the Court finds the compromise proposed by Rite Aid strikes an appropriate balance.  Rite Aid offered to produce documents and communications relating not only to Plaintiffs but also to hundreds of other insurers and government

payers, other than fee-for-service payers, and relating not only to Plaintiffs' PBMs but two additional PBMs, bringing the cumulative coverage to 90% of all claims adjudicated by any PBM in the U.S., as well as documents found in the course of that search that appear to describe a generalized view or standard as to U&C reporting.   If there is *relevant* extra-contractual information to be found within Rite Aid, there is no reason to believe it won't be found within that scope of production. Accordingly, the Court will grant Plaintiffs' motion with regard to Request No. 11 only to the extent contemplated by Rite Aid's proposed compromise, and will deny it in all other respects.

Because the Court has adopted Rite Aid's position that documents and information relating to government payers in Medicaid fee-for-service programs should be excluded—the primary bone of contention that led to this motion—that issue warrants specific attention.  Plaintiffs argue the distinction Rite Aid seeks to draw between these government payers and other TPPs is superficial.  (Pls' Mem. at 16.)  They claim states' rules governing Medicaid fee-for-service programs mirror private contracts requiring pharmacies to report U&C prices and align with the industry standard meaning of U&C price, so Rite Aid's communications with those programs about claims, U&C, and discounts are relevant to Rite Aid's fraud under the contracts here.  (*Id.* at 16–19.)  Plaintiffs argue further that PBMs have a financial incentive to align with Rite Aid because they make more money with higher prices.  (*Id.* at 19–20.)  They cite in support of this argument *Sheet Metal Workers Loc. No. 20 Welfare & Benefit Fund v. CVS Pharmacy, Inc.*, 540 F. Supp. 3d 182, 191 (D.R.I. 2021) ("PBMs have incentive to encourage or conceal inflated U&C prices – PBMs make more money when U&C prices

are higher").  Plaintiffs contend, therefore, that communications from government payers rather than solely from potentially biased PBMs will provide a fuller, more honest picture of the industry and Rite Aid's communications about the topics.  (*Id.*)

Rite Aid counters that each state's definition of U&C price is different, so its communications with those programs cannot reveal an industry standard or explore the fraud alleged here.  (Defs' Mem. at 24–26.)  Rite Aid cites as examples the different definitions of U&C in Arkansas, Louisiana, Massachusetts, New Jersey, and Oregon.  (*Id.* at 25–26.)  Rite Aid also cites *Forth v. Walgreen Co.*, No. 17 C 2246, 2019 WL 10255628, at *5 (N.D. Ill. July 10, 2019) and *United States ex rel. Garbe v. Kmart Corp.*, 73 F. Supp. 3d 1002, 1015–16 (S.D. Ill. 2014), *as amended* (Jan. 12, 2015), which acknowledge that state Medicaid fee-for-service programs use differing definitions of U&C price.  (*Id.* at 24.)

The Court is not persuaded that communications in the context of fee-for-service Medicaid programs is relevant.  Put simply, the contexts are different, and the Court is not convinced by Plaintiffs' argument that the governmental context is somehow likely to elicit more unguarded communications either within or outside of Rite Aid about what U&C reporting obligations are generally.[4]  As for Plaintiffs' reliance on *Sheet Metal Workers*, the passage Plaintiffs quote was the court's recitation of the allegations in the complaint and not a finding of fact, let alone an analysis of relevance.  540 F. Supp. 3d at

---

[4] The Court notes that the Honorable Paul R. Wallace appears to have arrived at a similar conclusion in a ruling from the bench in *Envolve Pharmacy Solutions, Inc., et al. v. Rite Aid Hdqtrs. Corp., et al.,* Case No. N19C-12-214 PCW (Del. Super. Ct. April 11, 2022) [ECF No. 116 at 38–39].

191.  Furthermore, the Court concludes that the additional burden of searching for such documents is out of proportion to any speculative relevance.  Rite Aid points out that its price reporting to these programs (as opposed to PBMs) was under the auspices of a different department, implicating different sources and custodians than for PBM communications.  (Defs' Mem. at 27.)  Furthermore, because such communications arose in the context of regulatory activity, they were even more likely to have involved legal oversight and advice from Rite Aid's attorneys, necessitating time-consuming and costly privilege review before any such communications could be cleared for production.  (*Id.*; Moen Decl. ¶¶ 24–26, 28.)  While the number of additional documents may be small by comparison with the documents Rite Aid will already be responsible for collecting and reviewing, the Court rejects the implied premise that every incremental burden is acceptable, no matter how speculative the incremental value of the outcome, if it pales in comparison to what the responding party has already undertaken.

Accordingly, the Court grants in part and denies in part Plaintiffs' motion with regard to Request No. 11, as set forth above.

> **B.    Whether Rite Aid Should Be Compelled to Produce Information Relating to Other "Litigations" Alleging Fraud or Related Torts Against the RSP and to Identify and Produce Documents Relating to All "Formal" or "Informal" Governmental Investigations, In Response to Interrogatory No. 4 and Requests Nos. 15 and 16**

As already noted, Interrogatory No. 4 asked that Rite Aid identify all "Litigations"—defined as any "formal or informal adjudicatory proceeding, including but not limited to lawsuits, governmental investigations, and arbitrations"—relating to any discount program.  (Ruby Ex. B at 3, 10–11.)  Request No. 15 sought all documents and

communications related to any such litigation.  (Ruby Ex. A at 14.)  Request No. 16

sought all documents "produced or otherwise provided" in any such litigation, including

all requests for production, interrogatories, and CIDs, all document productions and

discovery responses produced by Rite Aid, documents showing all witnesses or

custodians identified by any party as having relevant testimony or documents, and all

transcripts and exhibits from depositions.  (Ruby Ex. A at 14–15.)

Rite Aid responded to Interrogatory No. 4 with a list of lawsuits and arbitrations

against it concerning the RSP and U&C pricing, but objected to the definition of

"Litigations" insofar as it sought not only formal proceedings but "informal

governmental investigations" on the ground that it was vague and ambiguous.  (Ruby Ex.

S at 20–23 [ECF No. 99-19].)  Rite Aid offered in compromise, however, to disclose any

formal actions relating to U&C price reporting and the RSP, run a broad set of search

terms for any documents discussing U&C price reporting or the RSP and review those

documents for any indication of an "informal governmental investigation" that would be

relevant to Plaintiffs' allegations, and undertake additional good faith and reasonable

investigation into whether there was any "informal governmental investigation" that

would bear on the U&C price submitted to Plaintiffs' PBMs for Plaintiffs' members.

(Defs' Mem. at 5–6.)  As for Requests Nos. 15 and 16, Rite Aid proposed by way of

compromise that it would review all documents produced in other U&C lawsuits or

arbitrations, and in any informal investigations it might be able to identify through the

efforts discussed above, and produce any such documents that were relevant and

responsive to Plaintiffs' requests.  (*Id.*)  Rite Aid objected, however, to the wholesale

26

demand for documents relating to or produced in those cases on the ground that such "cloned discovery" is not particularized to the claims, issues, and defenses in the instant case. (*Id.* at 28–30.) It also objected that the request in No. 15 for "all documents" "related to any Litigation" was vague and overly broad.

The Court agrees. Request No. 15 could conceivably cover an overbroad and irrelevant swath of material ranging from attorneys' billing statements to communications between counsel about case scheduling, not to mention communications between client and counsel that would have to be reviewed for privilege. In addition, the Court agrees with Rite Aid that the request for "cloned discovery" implicit in both Requests Nos. 15 and 16 is not reasonably directed to information that is relevant to the claims and defenses in *this* case.

The Court finds the compromise proposed by Rite Aid as to these three discovery requests to be an appropriate resolution of the concerns raised. The proposal with regard to Interrogatory No. 4 appears to be a reasonable means of exploring whether there are any "informal investigations" in addition to the "formal" proceedings already disclosed by Rite Aid. As to Request No. 15, the compromise proposed by Rite Aid also provides reasonable particularity, although the Court clarifies here that it expects Rite Aid to review not only the documents produced in response to Rule 34 requests for production, but also other discovery materials—such as depositions and interrogatory answers—for documents that are relevant and responsive to Plaintiffs' requests (as narrowed by this Order).

One final issue bears discussion.  Plaintiffs had stated they would be satisfied with Rite Aid's proposed compromise on the discovery requests that are the subject of this motion provided information relating to fee-for-service Medicaid programs was produced, and with the understanding that Plaintiffs could still revisit the issue of the scope of the requests in the future, including through motion practice.  The Court has already addressed and rejected the first condition.  As for the second, the Court has found based on the showings of the parties that discovery beyond that ordered herein is not relevant and proportional to the needs of the case.  Plaintiffs may not attempt another bite at that apple.  However, the Court cannot rule out the possibility that the information produced by Rite Aid in compliance with this Order or otherwise could yield a much more concrete reason to believe that important new, non-cumulative information would be found in areas the Court is not now permitting Plaintiffs to pursue, and that the value of the information would outweigh the burden of collecting, reviewing, and producing it. If so, nothing in this Order precludes Plaintiffs from raising that issue with Rite Aid through the meet-and-confer process and, if that does not result in resolution, raising it with the Court for resolution through the IDR process or formal motion practice.

## IV.  Conclusion

Accordingly, based on all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Plaintiffs' Motion to Compel Defendants' Production of Documents [ECF No. 96] is **GRANTED IN PART** and **DENIED IN PART** as set forth herein.

Dated: June 21, 2022                    _/s Hildy Bowbeer_____
                                        HILDY BOWBEER
                                        United States Magistrate Judge